

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AUGUSTA MILLENDER, BRENDA
MILLENDER, WILLIAM JOHNSON,

                    Plaintiffs,

        v.

COUNTY OF LOS ANGELES, ET
AL.,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 05-2298 DDP (RZx)

**ORDER (1) GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
NOTICE OF MOTION AND MOTION FOR
SUMMARY ADJUDICATION; (2)
GRANTING IN PART AND DENYING IN
PART INDIVIDUAL DEFENDANTS'
NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT AND/OR SUMMARY
ADJUDICATION OF ISSUES; and (3)
GRANTING IN PART AND DENYING IN
PART MUNICIPAL DEFENDANTS' NOTICE
OF MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, FOR
SUMMARY ADJUDICATION OF ISSUES**

[Motions filed on September 18,
2006]

        This matter comes before the Court on: (1) Plaintiffs' Notice
of Motion and Motion for Summary Adjudication ("P's MSJ"); (2)
Individual Defendants' Notice of Motion and Motion for Summary
Judgment and/or Summary Adjudication of Issues ("ID's MSJ"); and
(3) Municipal Defendants' Notice of Motion and Motion for Summary
Judgment or, in the Alternative, for Summary Adjudication of Issues
("MD's MSJ").  After reviewing and considering the materials

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

1  submitted by the parties and hearing oral argument, the Court

2  adopts the following order.

3

4  I.   **Background**

5      On March 28, 2005, Augusta Millender, Brenda Millender and

6  William Johnson (collectively referred to as "Plaintiffs") filed a

7  Civil Rights Complaint with State Law Claims ("Compl.") against The

8  County of Los Angeles, the Los Angeles County Sheriff's Department,

9  and Sheriff Leroy Baca (collectively referred to as "Municipal

10 Defendants"), and 27 Los Angeles County deputies[1] (collectively

11 referred to as "Individual Defendants").  Specifically, Plaintiffs'

12 complaint includes three causes of action under 42 U.S.C. § 1983

13 for violations of the Fourth and Fourteenth Amendments and for

14 conspiracy to deprive them of their civil rights based on their

15 race (including Monell claims against the County of Los Angeles and

16 the Sheriff's Department, and supervisorial liability claims

17 against Sheriff Baca in his official and individual capacities).

18 The Complaint also includes supplemental claims for: violations of

19 the California Constitution; violations of civil rights under

20 *California Civil Code* §§ 52.1 & 51.7; negligence; and conspiracy.

21 Plaintiffs allege the following in their Complaint.

22      Plaintiffs allege that the violations of their rights caused

23 Plaintiffs special and general damages, physical injuries and

24 extreme emotional distress including, but not limited to, fright,

25 ───────────────────

26      [1]   While, at one time, there were 27 individual deputy
   Defendants, 16 of them have been terminated from the Complaint.
27 Therefore, the following 11 Individual Defendants remain:   Jack
   Demello, Robert J. Lawrence, Curt Messerschmidt, Donald Nichiporuk,
28 David O'Sullivan, Rick Rector, James Ritenour, Richard Schlegel,
   Ian Stade, Brice Stella, and Scott Walker.

shock, embarrassment, anger and other emotional distress.

(Complaint ¶ 22).  Augusta Millender was hospitalized, and Brenda

Millender and William Johnson moved.  (Id.)

## II.   Statement of Facts

Unless otherwise noted, the following facts are undisputed:

Augusta Millender ("Mrs. Millender") was 73 years old on November 6, 2003 and was being treated for diabetes and high blood pressure.  (Plaintiffs' Statement of Uncontroverted Material Facts and Conclusions of Law ("P's SUF"), No. 1).  She also had metal pins in her femur and used a walker.  (Id.)  On November 6, 2003, Mrs. Millender was living with her 47 year-old daughter, Brenda, who was being treated for high blood pressure and insulin-dependent diabetes.  (P's SUF No. 2).  On November 6, 2003, Mrs. Millender's grandson, William Johnson, who was Brenda's son, was also living at the house with Mrs. Millender and Brenda.  (P's SUF No. 3).  He was 20 years old at the time.  (Id.)  The Millenders lived at 2234 East 120th Street in Los Angeles, California (the "120th Street Address" or the "Millender Residence").  (P's SUF No. 4).

In 1982, Mrs. Millender first met her foster son, Jerry Bowen, who was 13 years old.  (P's SUF No. 5).  He lived with her until he was about 19 years old, which would have been 1987 or 1989.  (Id.) The next time Bowen stayed at Mrs. Millender's home was from January or February to March of 2003, when he stayed there only temporarily.  (P's SUF No. 6; Individual Defendants' Statement of Material Uncontroverted Facts and Conclusions of Law ("ID's SUF") No. 10).  When Bowen stayed at the house in 2003, he stayed in the back house, not in the main house.  (P's SUF No. 7).  Because, at

3

1 that time, Bowen did not have a regular address, he received mail

2 from the State of California and/or the County of Los Angeles at

3 the 120th Street Address.  (P's SUF No. 8; ID's SUF No. 10).

4     On October 17, 2003, while Shelly Kelly was moving out of her

5 apartment at 1425 W. 97th Street in Los Angeles ("the 97th Street

6 Address"), Bowen assaulted her.  (P's SUF No. 11; ID's SUF No. 1).

7 Due to Bowen's violent tendencies and some prior physical assaults

8 on her, Kelly had called the Sheriff's Department to stand by while

9 she moved her belongings out of her apartment.  (ID's SUF No. 2).

10 Approximately twenty minutes after the deputies arrived, they were

11 called away on an emergency of a child not breathing.  (ID's SUF

12 No. 3).

13     Kelly stated that, as soon as the deputies left the location,

14 Bowen appeared and the altercation began.  (Id.)  Bowen bit Kelly

15 and  attempted to push her down the stairs. (ID's SUF No. 1).

16 Kelly managed to get away from Bowen.  (P's SUF No. 12).  Bowen

17 grabbed Kelly by the front of her shirt with both of his hands.

18 (ID's SUF No. 3).  He also grabbed Kelly by the hair and tried to

19 pull her into the residence.  (Id.)  Kelly straddled the doorway

20 with her legs to keep him from pulling her inside.  (Id.)  Bowen

21 then grabbed both of her arms, at which time she was able to pull

22 out of her shirt and run to her vehicle.  (ID's SUF No. 4).  Bowen

23 went into the apartment and came back out with a sawed-off shotgun

24 with a pistol grip.  (Id.)  He stood in front of Kelly's vehicle

25 and told her he would kill her if she left.  (Id.)  Kelly laid down

26 on her seat and "punched it."  (Id.)  As she drove away in her car,

27 Bowen shot at her with the black sawed-off shotgun.  (P's SUF NO.

28 12; ID's SUF Nos. 1 & 4).  Kelly located police officers a short

1 time later. (ID's SUF No. 4). When they later interviewed Kelly
2 about the incident, deputies immediately recognized her and the
3 location as the same individual and address they had left earlier.
4 (ID's SUF No. 5). Kelly provided the deputies with four
5 photographs of the suspect to aid them in their investigation.
6 (Id.)

7      Curt Messerschmidt was the detective assigned to the case, and
8 he eventually authored a search warrant affidavit. (P's SUF No.
9 14; ID's SUF No. 6). Before meeting with Kelly, Messerschmidt
10 reviewed the incident report and a supplemental report prepared by
11 Deputy Hector Garcia regarding the assault incident. (ID's SUF No.
12 6).

13      On October 22, 2003, Messerschmidt met with Kelly at the
14 Lennox Sheriff's station, reviewed the incident report, and
15 verified the facts of the incident with her. (ID's SUF Nos. 8 &
16 13). During her interview, Kelly told Messerschmidt that Bowen did
17 not live at the 97th Street Address and was staying at the 120th
18 Street Address. (Id.) She also told Messerschmidt that "if she
19 wasn't mistaken," Bowen was "hiding out" at the Millender
20 Residence, which was his foster mother's house. (P's SUF No. 15;
21 ID's SUF No. 8). Messerschmidt did not ask and Kelly did not tell
22 him why she believed this to be true. (P's SUF No. 16).
23 Therefore, this information is not in Messerschmidt's warrant
24 affidavit. (Id.) Although Kelly allegedly told Messerschmidt that
25 she had been to the Millender Residence with Bowen prior to the
26 assault, he did not document it. (P's SUF No. 18; Deposition of
27 Curt Alan Messerschmidt, June 27, 2006 ("Messer. Depo."), attached
28 as Exh. X to Declaration of Robert Mann in Support of Plaintiffs'

1 Motion for Summary Adjudication ("Mann Decl."), at 51:23-52:9).

2 However, Mrs. Millender testified that she saw Kelly at her house

3 on at least two occasions. (ID's SUF No. 10). Kelly did not

4 actually use the term residence in telling Messerschmidt where she

5 thought Bowen could be found. (P's SUF Nos. 19 and 20). Kelly was

6 a drug dealer for 18 years, but had been clean for 8 years before

7 the incident with Bowen. (P's SUF No. 22).

8     Messerschmidt took photographs of the bruises and bite mark on

9 Kelly. (ID's SUF No. 13). Messerschmidt also reviewed the

10 photographs that Kelly had given the deputies. (Id.) Kelly

11 identified Bowen in a "six pack" line up after signing the "Witness

12 Admonition Mug Show Ups" form. (ID's SUF No. 14). Bowen was a

13 known Mona Park Crip gang member. (Id.)

14     Messerschmidt prepared a supplemental report of the interview

15 with Kelly and began doing further research to verify if the 120th

16 Street Address was a good address for Bowen. (ID's SUF No. 16).

17 According to his affidavit, Messerschmidt searched "departmental

18 records, state computer records and other police agency records" to

19 verify Bowen's address. (P's SUF No. 23). The affidavit does not

20 state with any further specificity what databases Messerschmidt

21 searched or what the records revealed. (Id.) Messerschmidt

22 states, however, that he searched DMV records, Cal-Gangs data

23 entries, California criminal history records and the National

24 Criminal Index Center. (ID's SUF No. 17). He also did a computer

25 search to verify Bowen's name, address and date of birth. (ID's

26 SUF No. 18). He checked the Consolidated Criminal History

27 Reporting System ("CCHRS"), which indicated that Bowen was on

28 summary probation for a spousal battery and an unlicensed driver

1  charge.  (Id.)  Messerschmidt checked Bowen's rap sheet/criminal

2  history on the California Law Enforcement Teletype System

3  ("CLETS"), which indicated Bowen's violent history and multiple

4  felony and misdemeanor arrests.  (ID's SUF No. 6).

5      Based upon the computer searches, the 97th Street Address was

6  the most current, not the 120th Street Address.  (P's SUF No. 24).

7  The Department of Motor Vehicles records Messerschmidt searched

8  indicated the most recent address for Bowen, as of September 3,

9  2003, was the 97th Street Address, not the 120th Street Address.

10 (P's SUF No. 25).  However, they also indicated that, as of March

11 27, 2003, Bowen's address was the 120th Street Address.  (ID's SUF

12 No. 18; P's SUF No. 26).  Furthermore, Bowen went back to the 97th

13 Street Address a week or two prior to the search warrant and

14 verified that Bowen was not staying there.  (ID's SUF No. 8).

15     The Gang Profile Records showed that, on May 17, 2003, Bowen

16 verbally told Century deputies that his address was the 120th

17 Street Address.  (P's SUF No. 27; ID's SUF No. 18).  According to a

18 restraining order issued May 16, 2003, Bowen's address at that time

19 was on Marvin Avenue.  (P's SUF No. 28).  The computer records

20 Messerschmidt searched did not indicate Bowen's current residence

21 address.  (P's SUF No. 29).

22     In training, police officers are taught that the successful

23 use of informants is critical in developing accurate information

24 pertaining to a case.  They are taught that informants are

25 information providers who could be a citizen victim, witness, paid

26 informant or suspect charged with a crime.  (ID's SUF No. 9).  In

27 this case, the informant was the victim, Kelly.  (Id.)

28

1      After Messerschmidt interviewed everybody and did all the
2  computer checks, he started gathering all his information and
3  prepared his search warrant affidavit for the issuance of an arrest
4  warrant for Bowen and a search warrant for the 120th Street
5  Address.  (ID's SUF No. 21).  Messerschmidt requested a Ramey
6  Warrant be issued for Bowen for his involvement in the assault.
7  (Id.)  The warrant affidavit was reviewed and approved by Sergeant
8  Lawrence, Messerschmidt's team sergeant at Lennox Operation Safe
9  Streets, and Lieutenant Ornales.  (Id.)  Deputy District Attorney
10 Janet Wilson also reviewed and approved the warrant.  (Id.)

11     On November 3, 2003, Messerschmidt consulted with Lieutenant
12 Maxwell of the Sheriff's Department Special Enforcement Bureau
13 ("SEB") SWAT Team.  (Id.)  As a result of that consultation, the
14 SEB SWAT team's Blue Team, under team leader Sergeant Walker, was
15 requested to assist with the warrant service at the 120th Street
16 Address.  (Id.; ID's SUF No. 27).

17     Messerschmidt applied for and obtained an arrest warrant for
18 Bowen and a search warrant for the Millender residence on November
19 4.  (P's SUF No. 37; ID's SUF No. 26).  Messerschmidt sought, and
20 the warrant authorized, night time service.  (P's SUF No. 38; ID's
21 SUF No. 23).  The warrant authorized seizure of:

22          All handguns, rifles, or shotguns of any
23          caliber, or any firearms capable of firing
24          ammunition, or firearms or devices modified
25          or designed to allow it to fire ammunition.
26          All caliber of ammunition, miscellaneous gun
27          parts, gun cleaning kits, holsters which
28          could hold or have held any caliber handgun

8

1                    being sought.  Any receipts or paperwork
2                    showing the purchase, ownership, or possess-
3                    ion of the handguns being sought.  Any fire-
4                    arm for which there is no proof of ownership.
5                    Any firearm capable of firing or chambered
6                    to fire any caliber ammunition.
7  (Mann Decl., Exh. J).  The warrant further authorized the seizure
8  of "[a]rticles of evidence showing street gang membership or
9  affiliation with any street gang to include but not limited to any
10 reference to 'Mona Park Crips', including writings or graffiti
11 depicting gang membership, activity or identity."  (<u>Id.</u>)  The
12 warrant also authorized "[a]rticles of personal property tending to
13 establish the identity of persons in control of the premise or
14 premises."  (Mann Decl., Exh J).  The warrant authorized the
15 seizure of any photographs which appeared relevant to gang
16 membership, might depict the item being sought, or might depict
17 any, undefined, criminal activity.  (P's SUF No. 45; ID's SUF No.
18 25).  Messerschmidt had no reason to believe Bowen's crime was a
19 "gang" crime.  (P's SUF No. 42).  Defendants respond that evidence
20 of gang affiliation is an enhancement to criminal charges.
21      Several days before the warrant service, the SEB SWAT
22 personnel began the information and planning process based on the
23 information given to them by Messerschmidt regarding the wanted
24 suspect, warrant location, and date and time of service.  (ID's SUF
25 No. 34).  The information was recorded on the SEB Activation
26 Request - Preliminary Data Form.  (<u>Id.</u>)  The SEB SWAT personnel
27 reviewed the search warrant, search warrant checklist, Bowen's
28 criminal history, the operations plan from Messerschmidt's unit,

1 and photographs.  (Id.)  Based on this, they developed a tactical

2 plan.  (Id.)  Walker took Bowen's criminal history and active gang

3 membership into consideration in formulating the plan for warrant

4 service.  (Id.)  Walker reviewed the search warrant and supporting

5 affidavit with his team before it was served to be sure that they

6 knew what was included in the warrant, explained the plan and

7 briefed everybody on their assigned role.  (ID's SUF Nos. 29 & 34).

8 After the search was completed, information regarding the tactical

9 plan was filled out in the Team Activation Packet.  (ID's SUF Nos.

10 30 & 34).  The mission for SEB personnel was "to safely execute the

11 search warrant, detain all the occupants on the property and secure

12 the location for investigators."  (Id.).  Once that was

13 accomplished, the investigators would continue their investigation.

14 (Id.)  The "Plans to Accomplish the Mission" section of the Team

15 Activation Packet stated that:

16              Once containment personnel are in place, the

17              entry team will approach the front of the

18              location on the armored rescue vehicle.  The

19              entry team, along with the front containment

20              team will off load from the vehicle and

21              approach the front door.  Knock and notice

22              announcements will be given via a pre-recorded

23              taped announcement on a PA system as well as

24              verbal announcements at the front door.  If

25              there is no acknowledgment at the door by

26              the occupants, the team will breach the front

27              door and make limited penetration into the

28              house.  In addition, the window near the front

1          door will be ported so that we can provide

2          cover for the breaching team as well as

3          providing us the opportunity to prevent

4          injury to occupants inside.  If occupants are

5          encountered, they will be directed towards us

6          and lead outside to a safe area.  Once the

7          occupants are out, the team will clear the

8          location and render it safe for the handling

9          detectives.

10 (ID's SUF No. 31).  The following SEB SWAT Team Blue Team personnel

11 were assigned positions as follows:  Entry Team - Walker, Rector,

12 Nichiporuk, Schlegel, Stella, Demello, O'Sullivan and Ritenour;

13 Containment Team - Wilber, Harris, Stade, Murray, Foisner, Bones,

14 Geisler, Desmarteau, Parga, Hayes and Conti; Emergency medical

15 personnel: Harrell and McCabe.  (ID's SUF No. 32).

16          On November 4, 2003, two days before the service of the

17 warrant, Walker drove by the Millender residence in an undercover

18 vehicle in order to obtain photographs for the warrant service

19 planning.  (ID's SUF No. 35).  He was accompanied by Deputies

20 Rector, Nichiporuk, Stella and Stade.  (Id.)  They took photographs

21 and looked at the area in order to determine how they were going to

22 serve the warrant.  (Id.)  They did not have contact with anyone

23 from the residence on that date.  (Id.)

24          On November 5, 2003, Walker, Stella, Rector and Nichiporuk

25 drove around the area of the Millender Residence for an opportunity

26 to arrest Bowen if they happened to see him.  (P's SUF No. 31; ID's

27 SUF No. 36).  Deputies Stella and Walker contacted four to five

28 male blacks who were shooting dice on the sidewalk directly in

front of the Millender Residence.  (ID's No. 36).  Deputies Stella
and Walker spoke with the males, a couple of whom matched Bowen's
general description, while Deputies Rector and Nichiporuk walked
down the Millender's driveway.  (<u>Id.</u>)  Stella and Walker determined
that Bowen was not part of the group.  (<u>Id.</u>)  The deputies
approached the house in broad daylight without their weapons drawn.
(P's SUF No. 32).  Deputies Rector and Nichiporuk spoke with Mrs.
Millender and Brenda on their driveway.  (P's SUF No. 33; ID's SUF
No. 36).  Walker saw an older woman who he now believes was Mrs.
Millender speaking to them, but could not here what they were
saying.  (ID's SUF No. 36).  Walker saw another female outside who
he now believes was Brenda Millender.  (<u>Id.</u>)  Rector talked to
either Mrs. Millender or Brenda Millender and asked her about the
men in front of the house.  (<u>Id.</u>)  The woman said she did not know
the men and did not give them permission to be there.  (<u>Id.</u>)  The
SEB deputies who were at the Millender Residence on November 5,
2003, the day before the search warrant execution, did not document
what occurred there and did not tell Messerschmidt anything about
it.  (P's SUF No.34).

At approximately 5:00 a.m. on November 6, 2003, the SEB Blue
Team served a high-risk search and arrest warrant at 2234 E. 120th
Street.  (P's SUF No. 47; ID's SUF No. 28).  Messerschmidt and
Detective Pickett were positioned in the middle of the street to
the east of the location in order to stop traffic.  (ID's SUF No.
28).

The residence was occupied by the Millender Family.  (ID's SUF
No. 28).  Mrs. Millender, Brenda and William were asleep when the
deputies arrived.  (P's SUF No. 48).  Defendants played a pre-

recorded announcement over a PA system from a radio car parked in
the street.  (P's SUF No. 49; ID's SUF No. 39).  When there was no
response from the interior of the main house, Walker ordered
O'Sullivan to "break and rake" the front window.  (ID's SUF No.
40).  Deputies also forced open the front security door.  (Id.)  As
the team entered the house, they continued to identify themselves
as law enforcement personnel and said that they had a search
warrant.  (ID's SUF No. 42).  Rector, Nichiporuk and Walker were
the first three through the door.  (Id.)  Upon entering the house,
deputies encountered Mrs. Millender, Brenda and William, who all
followed the deputies instructions and went outside to wait.  (P's
SUF No. 55; ID's SUF Nos. 42, 44 & 45).

        The deputies proceeded to search and clear the house, which
took approximately 20 minutes.  (P's SUF No. 56; ID's SUF No. 49).
Once the main house was cleared, the entry team went to the east
side of the house and exited the kitchen, which led to the entrance
of a large addition that was attached to the house but had its own
outside entrance.  (ID's SUF No. 49).  Mrs. Millender's adult sons
resided there.  (P's SUF No. 57).  Rector made the announcement for
the people inside the addition to come out.  (ID's SUF No. 49).
The deputies did not forcibly enter the back house.  (P's SUF No.
58).  At the back house, the deputies waited for over a minute for
the occupants to get dressed and come out, which all seven of them
did without incident.  (P's SUF No. 59; ID's SUF No. 49).  None of
the people in the addition are plaintiffs in this action.  (ID's
SUF No. 50).

        Walker recorded on audio tape the entry on November 6, 2003.
(ID's SUF No. 53).  The SEB Team left the 120th Street Address

13

after the warrant service somewhere past 5:45 in the morning.
(ID's SUF No. 54).  Walker did not handcuff anyone, or have any
contact with any occupants after they were directed outside of the
house.  (ID's SUF No. 51).  He did not participate in searching the
house.  (Id.)

When exiting the house, Brenda Millender told the deputy she
did not want to step outside the house onto the porch, because she
was a diabetic and there was glass on the ground.  One of the
officers took a rug from her mother's living room and threw it over
the glass.  (ID's SUF No. 46).  The officer who escorted her out
helped her walk across the glass.  (Id.)  Mrs. Millender, Brenda
and William waited outside until the house was secured, most of the
time being allowed to sit inside patrol cars because they were
cold.  (P's SUF No. 62; ID's SUF Nos. 45 & 48).  Brenda asked a
deputy for a blanket, and he gave her one.  (ID's SUF No. 47).
While outside, Mrs. Millender told the deputies she needed to use
the restroom.  (P's SUF No. 63).  Because the deputies would not
allow her back into the house until the SWAT Team was done clearing
and securing the location, Mrs. Millender relieved herself in the
street.  (Id.; ID's SUF No. 45).  For at least some portion of
time, William Johnson was handcuffed.  (P's SUF No. 65).  During
the time that Brenda and Mrs. Millender were sitting in the police
cars, Brenda did not complain that she had injuries, and Mrs.
Millender never told the deputies that she had to go to the
hospital.  (ID's SUF No. 56).

After the location was secured, the deputies brought Mrs.
Millender, Brenda and William into the living room while they
completed the search of the house.  (P's SUF No. 64; ID's SUF No.

14

55).  Brenda was allowed to go to the restroom and to go to her
room to get some shoes and a blanket.  (ID's SUF No. 55).  Lawrence
watched the occupants in the living room.  (ID's SUF No. 57).  He
did not apply handcuffs to anyone, or arrest anyone, and did not
point his weapon at anyone.  (Id.)  Stade was assigned to
containment outside the east side of house.  (ID's SUF No. 57).  He
did not apply handcuffs to anyone, arrest anyone, or participate in
the search of the residence.  (Id.)

Faulkner, Ortega, Pickett, Valento, Cale and Bercini searched
the house.  (ID's SUF No. 59).  When the search was over,
Messerschmidt gathered the pieces of evidence being seized, had the
property receipt signed and left.  (ID's SUF No. 59).  The deputies
seized Mrs. Millender's personal shotgun, a State of California
Social Services letter addressed to Bowen, and .45 caliber
"American Eagle" ammunition.  (P's SUF No. 66; ID's SUF No. 60).

Bowen was not found at the location.  (P's SUF No. 60).
Bowen's black, sawed-off shotgun was not found at the location.
(P's SUF No. 61).  On November 19, 2003, after the search of the
Millender Residence, Messerschmidt, without SWAT assistance,
arrested Bowen in the middle of the day.  (P's SUF No. 36).  He was
hiding under a bed in a motel room occupied by Bowen and his wife,
after knocking and being admitted by Bowen's wife.  (Id.)

One of the occupants of the back house was Mrs. Millender's
son, Willie Millender, who was arrested for being under the
influence.  (P's SUF No. 67).  Criminal charges were filed against
Willie Millender in People v. Millender, Case No. 3CM09209 in the
California Superior Court of the South Central Judicial District of
the County of Los Angeles.  (P's SUF No. 68).  Mr. Millender,

1   represented by a public defender, made a motion to suppress based

2   upon lack of probable cause in Messerschmidt's warrant affidavit.

3   (P's SUF No. 69).   The court granted Mr. Millender's motion to

4   quash the warrant on the grounds that the affidavit did not

5   establish probable cause to believe Bowen would be found at

6   Plaintiffs' home.   (P's SUF No. 70).   The case was dismissed and

7   not refiled.   (Id.).   Detective Messerschmidt was the investigator

8   on the case.   (P's SUF No. 71).   Messerschmidt testified under oath

9   in the hearing on Mr. Millender's motion to suppress.   (P's SUF No.

10  72).   The hearing transcript is 80 pages and includes direct and

11  redirect examination of the People's witness, Messerschmidt, as

12  well as cross examination of both Mrs. Millender and Brenda, and a

13  closing argument.   (P's SUF No. 74).

14       Sheriff Leroy Baca was sued in his official capacity.

15  (Municipal Defendants Statement of Uncontroverted Facts and

16  Contentions of Law ("MD's SUF") No. 5).   Plaintiffs' complaint does

17  not involve allegations of interference with Plaintiffs' rights "to

18  make and enforce contracts , to sue, be parties, give evidence, and

19  to the full and equal benefit of all laws and proceedings for the

20  security of persons and property."   (MD's SUF No. 6).   Plaintiffs'

21  complaint does not involve allegations of interference with

22  Plaintiffs' rights "to inherit, purchase, lease, sell, hold, and

23  convey real and personal property."   (MD's SUF No. 8).   Plaintiffs

24  allege that "wrongs" were done to them on or about November 4, 2003

25  or November 6, 2003.   (MD's SUF No. 15).

26       Plaintiffs' Count Six names only the County of Los Angeles as

27  a defendant.   (MD's SUF No. 23).   Plaintiffs' Count Seven names

28  only the County of Los Angeles as a defendant.   (MD's SUF No. 26).

16

1   The deputies of the Los Angeles County Sheriff's Department

2   received extensive training prior to and during their tenure in

3   compliance with the established standards for California peace

4   officer training (P.O.S.T. standards).   (MD's SUF No. 28).

5

6   **III. Legal Standard on a Motion for Summary Judgment**

7        Under the Federal Rules of Civil Procedure 56(c), summary

8   judgment is proper only where "the pleadings, depositions, answers

9   to interrogatories, and admissions on file, together with the

10  affidavits, if any, show that there is no genuine issue as to any

11  material fact and that the moving party is entitled to a judgment

12  as a matter of law."  Fed. R. Civ. P. 56.   The moving party has the

13  burden of demonstrating the absence of a genuine issue of fact for

14  trial.   See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

15  (1986).   If the moving party satisfies the burden, the party

16  opposing the motion must set forth specific facts showing that

17  there remains a genuine issue for trial.  See <u>id.</u>; Fed. R. Civ. P.

18  56(e).

19       A non-moving party who bears the burden of proof at trial to

20  an element essential to its case must make a showing sufficient to

21  establish a genuine dispute of fact with respect to the existence

22  of that element of the case or be subject to summary judgment.  <u>See</u>

23  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).   Such an issue

24  of fact is a genuine issue if it reasonably can be resolved in

25  favor of either party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 250-51.   The non-

26  movant's burden to demonstrate a genuine issue of material fact

27  increases when the factual context renders her claim implausible.

28  <u>See</u> <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475

17

U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Thus, mere
disagreement of the bald assertion that a genuine issue of material
fact exists, no longer precludes the use of summary judgment.  See
Harper v. Wallingform, 877 F.2d 728 (9th Cir. 1989); California
Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,
818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006
(1988).

     If the moving party seeks summary judgment on a claim or
defense on which it bears the burden of proof at trial, it must
satisfy its burden by showing affirmative, admissible evidence.
Unauthenticated documents cannot be considered on a motion for
summary judgment.  See Hal Roach Studios v. Richard Feiner and Co.,
896 F.2d 1542, 1550 (9th Cir. 1987); Canada v. Blain's Helicopters,
Inc., 831 F.2d 920, 925 (9th Cir.1987).  A document is
authenticated when it is has the proper foundation.  Canada, 831
F.2d at 925; Hamilton v. Keystone Tankship Corp., 539 F.2d 684, 686
(9th Cir.1976); United States v. Dibble, 429 F.2d 598, 601-02 (9th
Cir.1970).

     On a motion for summary judgment, admissible declarations or
affidavits must be based on personal knowledge, must set forth
facts that would be admissible evidence at trial, and must show
that the declarant or affiant is competent to testify as to the
facts at issue.  See Fed. R. Civ. P. 56(e).  Declarations on
"information and belief" are inappropriate to demonstrate a genuine
issue of fact.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.
1989).

## IV.   Discussion

### A.   Failure to Meet and Confer

Before discussing the merits of the Parties' cross-motions for summary judgment, the Court notes that Plaintiffs argue that Municipal Defendants' Motion must be denied in its entirety, because Defendants failed to meet and confer regarding the issues included in the Motion.[2]  Central District Local Rule 7-3, ("Local Rule 7-3"), provides, in relevant part, that "counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, *preferably in person*, the substance of the contemplated motion and any potential resolution.  Local Rule 7-3.

In support of their argument that Defendants failed to meet and confer regarding Municipal Defendants' Motion, Plaintiffs note that defense counsel, Trevor Grimm, sent two letters to Plaintiffs' counsel.  The first letter, dated July 10, 2006, listed several grounds for Defendants' proposed motion for summary judgment, including: (1) Deputy Messerschmidt made a reasonable investigation, which gave him probable cause to believe that Bowen would be at the Millender residence; (2) the search of databases for Bowen's criminal history was a reasonable and reliable step to determine Bowen's residence; (3) Messerschmidt investigated the fact that one of the documents searched suggested that Bowen resided at the 97th Street address (Kelly's apartment); (4) the

---

[2]   The specific issues in Municipal Defendants' Motion are: (1) Monell liability; (2) Plaintiffs' various conspiracy theories; (3) that Sheriff Baca is not a proper Defendant; (4) racial discrimination; (5) claims for damages under the California Constitution; and (6) County's alleged immunity for negligent employment and immunity under the Eleventh Amendment.  (Plaintiffs' Opposition to the County Defendants' Motion for Summary Judgment ("Plaintiff's Opp."), 1:9-12).

1  fact that a state criminal court judge denied the validity of the

2  warrant for other purposes, is not dispositive of the validity of

3  the warrant for purposes of searching for Bowen; (5) the warrant

4  execution was carried out in a reasonable manner; (6) there need

5  only have been a "fair probability" that Bowen and the items to be

6  seized were at the Millender residence; and (7) the length of time

7  between the knock/notice and entry was reasonable.  (Declaration of

8  Donald W. Cook in Support of Plaintiffs' Opposition to Defendants'

9  Motions for Summary Adjudication ("Cook Decl."), Exh. JJ at 49-51).

10       The second letter, dated August 29, 2006, repeated the first

11  letter verbatim, but added the issue of qualified immunity for the

12  Individual Defendants based upon their reliance on the warrant.

13  (Cook Decl. Exh. JJ at 52-54).  Thus, Plaintiffs contend that,

14  because none of the issues in the Municipal Defendants' Motion were

15  addressed by Defendants at any time, Plaintiffs did not have

16  sufficient opportunity to prepare to oppose these issues.

17       According to Grimm, he discussed the lack of municipal

18  liability with Plaintiffs' counsel at the same time that

19  Plaintiffs' counsel discussed their theories as to why there is

20  municipal liability.  (Declaration of L. Trevor Grimm in Support of

21  Defendants Reply ("Grimm Decl."), ¶ 14).  Grimm also contends in

22  his Reply that, at the very least, these issues were discussed in

23  detail in the context of meeting and conferring regarding

24  Plaintiffs' Motion for Summary Judgment.  (MD's Reply at 2:22-3:7).

25       Furthermore, as Defendants point out, Defense counsel's July

26  10, 2006 meet and confer correspondence advised Plaintiffs that

27  Defendants intended to "file a motion for summary judgment for an

28  order adjudicating this case summarily in *all* defendants' favor."

1  (Cook Decl., Exh. JJ at 49).  The reasons listed in such letter go

2  to Municipal Defendants' liability as well as the liability of

3  Individual Defendants.  (Id. at 49-51).  Therefore, the court

4  declines to deny Municipal Defendants' Motion for Summary Judgment

5  on the basis of Local Rule 7-3.  This Court does remind the

6  Parties, however, that it expects full compliance with Local Rule

7  7-3.

8  **B.   Probable Cause to Establish that Bowen Could be Found at**

9  **the Millender Residence**

10  Plaintiffs move for summary adjudication on their claim that

11  the affidavit did not establish probable cause to believe that

12  Bowen could be found at the Millender Residence.

13  **1.   Collateral Estoppel**

14  As an initial matter, Plaintiffs point out that, in People v.

15  Millender, Case No. 3CM09290, the Los Angeles Superior Court

16  quashed the warrant to search the Millender Residence, because the

17  affidavit did not establish probable cause to believe Bowen would

18  be found there.  (Mann Decl., Exh. T at 75:6-77:14).  In

19  particular, Judge Johnson found that there was insufficient

20  probable cause, because the affidavit referred only to the search

21  of generic records (i.e., departmental records, state computer

22  records and police agency records), rather than pointing to the

23  specific records searched.  (Id.)  Because the only thing left in

24  the affidavit was Kelly's statement, which he determined was not

25  enough, Judge Johnson granted Defendant's motion to quash the

26  warrant.[3]  (Id. at 76:2-77:6).  As a result of the ruling, the

---

[3]     It should be noted that, at the same hearing, Judge

(continued...)

1  People were unable to proceed, and the court granted defendant

2  Willie Millender's motion to dismiss.  (<u>Id.</u> at 77:8-14). Plaintiffs

3  indicate in their current Motion, and Defendants do not dispute,

4  that no appeal was taken and there have been no further

5  proceedings.  (P's MSJ at 9:3).  Therefore, Plaintiffs contend that

6  Defendants are collaterally estopped from re-litigating the

7  affidavit's sufficiency in the current Action.

8     The Full Faith and Credit Clause of the United States

9  Constitution requires that federal courts "must give to a state-

10  court judgment the same preclusive effect as would be given that

11  judgment under the law of the State in which the judgment was

12  rendered."  <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S.

13  75, 80 (1984).  Under California law, collateral estoppel applies

14  if: "(1) the issue necessarily decided at the previous [proceeding]

15  is identical to the one which is sought to be relitigated; (2) the

16  previous [proceeding] resulted in a final judgment on the merits;

17  and (3) the party against whom collateral estoppel is asserted was

18  a party or in privity with a party at the prior [proceeding]."

19  <u>Lombardi v. City of El Cajon</u>, 117 F.3d 1117, 1121 (9th Cir. 1997)

20  (citing <u>People v. Sims</u>, 32 Cal. 3d 468, 484, 186 Cal. Rptr. 77, 87,

21  1651 P.2d 321 (1982)).  Plaintiffs argue that "[since there was a

22  final judgment as to one relevant, identical issue, the only

23  question is privity."  (P's MSJ at 9:15-16).  The Court disagrees.

24

25  _____

26     [3]  (...continued)
    Johnson also (1) denied Willie Millender's motion to traverse

27  (ruling that the information supposedly left out of the affidavit
    would not have made a difference); and (2) denied Willie

28  Millender's motion that the entry team violated the knock notice
    rules.  (Mann Decl., Exh. T at 74:13-75:5).

1    Even though the Parties do not raise the question of the
2  "finality" of the state court's decision, the Ninth Circuit has
3  previously held that "suppression rulings under Cal. Penal Code §
4  1538.5, if not followed by a conviction or an acquittal, are not
5  final judgments under California law and therefore are without
6  collateral estoppel effect in a subsequent civil suit."[4]  Lombardi,
7  117 F.3d at 1121 (citing Heath v. Cast, 813 F.2d 254, 258 (9th Cir.
8  1987).   Here, as in Lombardi, the criminal case against Willie
9  Millender was dismissed before it was decided on the merits.
10 Therefore, Willie Millender was not convicted or acquitted, and
11 there was no final judgment for collateral estoppel purposes.
12 Because, there was no final judgment, this Court need not address
13 the other elements of collateral estoppel.

14    Defendants are not precluded from relitigating the sufficiency
15 of the affidavit in this Court.   Accordingly, Plaintiffs' Motion to
16 this effect is denied.

17            **2.   Sufficiency of the Affidavit**

18    Plaintiffs next argue that, if collateral estoppel does not
19 preclude Defendants from re-litigating the issue, this Court must
20 find that, as a matter of law, the affidavit did not establish
21 probable cause.   Defendants similarly move for summary adjudication
22 on the issue of whether the affidavit was sufficient to establish
23 probable cause.

24    Plaintiffs first contend that, on its face, the affidavit did
25 not establish probable cause to believe Bowen would be found at the

26 _____

27      [4]   California Penal Code § 1538.5, which covers motions to
   suppress evidence, includes both motions to quash, Cal. Penal Code
28 § 1538.5(a)(1)(B)(I), and motions to traverse, Cal. Penal Code §
   1538.5(a)(1)(B)(iii).

1  Millender Residence.  Second, Plaintiffs argue that the affidavit

2  contained misrepresentations and that Messerschmidt omitted

3  relevant facts, and that, therefore, Messerschmidt misled the

4  issuing magistrate.

5                      **a.   Facial Challenge**

6      It is undisputed that the "statement of probable cause" in the

7  affidavit prepared and submitted by Detective Messerschmidt

8  contained the following information relevant to the determination

9  of Bowen's whereabouts:  (1) Kelly, the victim of the physical

10  assault allegedly perpetrated by Bowen, is Bowen's former

11  girlfriend and identified him immediately in a "six pack" photo

12  line up; (2) Kelly provided Messerschmidt with a current address of

13  the suspect's residence - the 120th Street Address; (3) Kelly

14  stated that she had been told by her neighbors that the suspect had

15  been seen coming back to the 1425 W. 97th Street Address, where the

16  assault occurred; (4) the affiant, Messerschmidt, conducted an

17  extensive background search on Bowen by utilizing departmental

18  records, state computer records, and other police agency records;

19  and (5) based on the extensive search and information provided by

20  the victim, Messerschmidt determined that Bowen resides at 2234 E.

21  120th Street in Los Angeles.  (Mann Decl. Exh. J).  Plaintiffs

22  contend that, as a matter of law, this information was not enough

23  to establish probable cause, while Defendants make the opposite

24  argument.

25      <u>Illinois v. Gates</u> sets forth the appropriate standard for

26  determining whether an affidavit provides sufficient probable cause

27  to justify a search warrant.  462 U.S. 213 (1983).  In <u>Gates</u>, the

28

1  United States Supreme Court applied a "totality-of-the-
2  circumstances" analysis and held that:

3          [t]he task of the issuing magistrate is simply
4          to make a practical, common-sense decision
5          whether, given all the circumstances set forth
6          in the affidavit before him, including the
7          'veracity' and 'basis of knowledge' of persons
8          supplying hearsay information, there is a fair
9          probability that contraband or evidence of a
10         crime will be found in a particular place.
11         And the duty of the reviewing court is simply
12         to ensure that the magistrate had a 'substantial
13         basis for conclud[ing]' that probable cause
14         existed.
15  Id. at 238-39.  The Gates Court further stated that "[s]ufficient
16  information must be presented to the magistrate to allow that
17  official to determine probable cause" and that "his action cannot
18  be a mere ratification of the bare conclusions of others." Id. at
19  239.

20      The Gates Court made clear that the probable cause standard is
21  a "practical, nontechnical conception" that deals with
22  probabilities rather than hard certainties.  Id. at 231.
23  "Veracity" or "reliability" and "basis of knowledge" should be
24  understood as "relevant considerations in the totality-of-the-
25  circumstances analysis" such that "a deficiency in one may be
26  compensated for, in determining the overall reliability of a tip,
27  by a strong showing as to the other, or by some other indicia of
28  reliability." Id. at 233.  In Gates, the Court also "recognized

1  the value of corroboration of details of an informant's tip by
2  independent police work," noting that "an officer may rely upon
3  information received through an informant, rather than upon his
4  direct observations, so long as the informant's statement is
5  reasonably corroborated by other matters within the officer's
6  knowledge."  Id. at 242 (citations omitted).  Finally, the Court
7  emphasized the importance of deferring to the magistrate's decision
8  regarding probable cause, stating that "we have repeatedly said
9  that after-the-fact scrutiny by courts of the sufficiency of an
10 affidavit should not take the form of *de novo* review," that a
11 "magistrate's determination of probable cause should be paid great
12 deference by reviewing courts," and that "courts should not
13 invalidate warrants by interpreting affidavits in a hypertechnical,
14 rather than a commonsense, manner."  Id. at 236.

15     Plaintiffs argue that the affidavit did not provide probable
16 cause for a warrant, because (1) Messerschmidt's reference to
17 unidentified police records was inadequate in that it did not name
18 the specific records searched and told the magistrate nothing; and
19 (2) Kelly's claim of residence had virtually no value, since the
20 affidavit stated nothing about her "basis of knowledge."
21 Defendants, on the other hand, contend that the same information
22 did, as required by Gates, support a "fair probability" that Bowen
23 would be found at the Millender Residence.  Additionally,
24 Defendants state that: (1) the computer records searched included
25 Department of Motor Vehicles ("DMV") and Cal Gangs records; (2)
26 Kelly told Messerschmidt that Bowen was not staying with her at the
27 97th Street Address and was staying with his foster mother at the
28 120th Street Address, and that she had been to the Millender

26

Residence with Bowen prior to the assault; and (3) Messerschmidt went to the 97th Street Address a week or two prior to the search and verified that Bowen was not staying there.  While this information is certainly relevant, Plaintiffs are correct that "[i]n reviewing the validity of a search warrant, a court is limited to the information and circumstances contained within the four corners of the underlying affidavit."  <u>United States v. Stanert</u>, 762 F.2d 775, 778 (9th Cir. 1985).

Considering only the information specifically included in the affidavit, this Court finds that the question of whether such affidavit supported a finding of probable cause is a very close one.  Plaintiffs are correct that it would not have been difficult for Messerschmidt to question Kelly as to her exact basis of knowledge on Bowen's whereabouts and to include that information in the affidavit.  Such information, if reliable, would have bolstered the affidavit.  That being said, this Court also feels that, considering Kelly's relationship to Bowen, the magistrate could have reasonably determined that her statement was reliable. Furthermore, the magistrate could reasonably have determined that Messerschmidt's statement that he had "conducted an extensive background search on the suspect by utilizing departmental records, state computer records, and other police agency records" provided adequate police corroboration.  This Court disagrees with Plaintiffs that Messerschmidt's failure to specify the exact records searched renders the affidavit invalid on its face.  Had the magistrate felt it necessary to know this information, he could simply have said so.  Therefore, keeping in mind the statements of the <u>Gates</u> Court regarding deference to the issuing magistrate, this

27

1 Court finds that the warrant was, as a matter of law, facially

2 valid.

3 **b.   Judicial Deception**

4     Plaintiffs next argue that, even if the affidavit was valid on

5 its face, it is in fact, invalid because it was based on

6 misrepresentations, in that it includes false statements and/or

7 fails to include relevant facts.  Plaintiffs contend, therefore,

8 that Messerschmidt misled the magistrate and that, in its corrected

9 form, the affidavit does not establish probable cause.[5]

10 Defendants, on the other hand, contend that Messerschmidt did not

11 mislead the magistrate.

12     In support of their contention that Messerschmidt misled the

13 issuing magistrate, Plaintiffs argue that "Messerschmidt

14 misrepresented what Kelly said" and that "Messerschmidt

15 misrepresented the information in police records."  (Plaintiffs'

16 MSJ at 16:13-17:5).  Plaintiffs rely on law addressing both

17 misrepresentations and omissions.

18     The first misrepresentation of fact to which Plaintiffs point

19 is Messerschmidt's statement that Kelly provided him with "a

20 current address of the suspect <u>residence</u>."  (Mann Decl. Exh. J)

21 (emphasis added).  Specifically, during her interview with

22 Messerschmidt, Kelly did not use the word "reside" or "residence."

23 (Videotape of Messerschmidt's October 22, 2003 Interview with

24 Shelly Kelly, attached as Exh. C to the Mann Decl.).  Rather, she

25 simply said that Bowen was "staying at" or "hiding out at" the

26

27         [5]   Plaintiffs also contend that, under California law, the
   "corrected form" of the affidavit need not even be considered
28 because Messerschmidt made knowing/intentional misrepresentations.

1  120th Street Address.  (Id.)  Plaintiffs contend that a lay person

2  cannot reliably opine as to what constitutes a residence, that even

3  judges sometimes disagree on this question, and that Bowen did not

4  "reside" with the Millenders.  The Parties do not dispute the fact

5  that, in the videotaped interview, Kelly did not actually use the

6  word "reside."[6]  (Id.)  Thus, the question is whether

7  Messerschmidt's use of the word "reside" was a misrepresentation

8  that misled the magistrate.

9      Additionally, Plaintiffs argue that Messerschmidt misled the

10  magistrate because (1) He did not include in the affidavit that,

11  when asked during the videotaped interview if Bowen was staying at

12  the 120th Street Address, Kelly responded "I believe so, if I'm not

13  mistaken.  I believe that's where he is hiding out at." (Mann Decl.

14  Exh. C); and (2) Messerschmidt unequivocally represented that

15  police records showed that the 120th Street Address was Bowen's

16  "residence," rather than including that Bowen's most recent address

17  was the 97th Street Address, that such records last associated

18  Bowen with the 120th Street Address in May, and that the records

19  also showed that Bowen was using a Marvin Avenue address in May.

20      It is undisputed that the DMV records Messerschmidt searched

21  indicated that Bowen's most recent address, as of September 3,

22  2003, was the 97th Street Address where the assault occurred, and

23  that his next most recent address was the 120th Street Address

24  (March 27, 2003).  (Mann Decl. Exh. G at 52; Messerschmidt Decl.

25  _____

26      [6]     Defendants have objected to Plaintiffs' submission of a
   transcript of the videotaped interview, which they created
27  themselves on the grounds that the videotape itself is the best
   evidence.  The Court notes that it does not rely on the transcript
28  for any determinations made in this Order.  Rather, the Court
   relies on the videotape itself, which both Parties submitted.

Exh. F).   It is also undisputed that, according to Bowen's "Gang

Member Subject File Report" in the Cal Gangs records, Bowen

verbally told Century deputies on May 17, 2003, that his address

was the 120th Street Address.   (Mann Decl. Exh. G at 50;

Messerschmidt Decl. Exh. G at 61).   Similarly, Bowen's Consolidated

Criminal History Reporting System ("CCHRS") record indicated that

the Millender Residence was his address as of May 17, 2003.   (Mann

Decl. Exh. G at 64).   Finally, Messerschmidt also checked the

County Warrant System and found documentation of a restraining

order issued on May 16, 2003.   That printout indicated an address

of 2303 South Marvin Avenue.   (Mann Decl. Exh. G at 44;

Messerschmidt Depo. at 62:16-63:11).   None of this information was

included in the affidavit.   Thus, Plaintiffs ask this Court to find

that the affidavit did not establish probable cause that Bowen

could be found at the Millender Residence, and the search was,

therefore, unreasonable in violation of the Fourth Amendment to the

United States Constitution and California Constitution Article I,

section 13.

### (1)   *The Federal Standard*

As discussed above, Plaintiffs argue that Messerschmidt

submitted false and misleading information in, and/or omitted

relevant information from, his affidavit to the magistrate, who

then relied upon that information, or lack thereof, in finding

probable cause for the search warrant.   To prove such a claim under

federal law, Plaintiffs "must make (1) a substantial showing of

deliberate falsehood or reckless disregard for the truth, and (2)

establish that but for the dishonesty, the challenged action would

1  not have occurred." <u>Butler v. Elle</u>, 281 F.3d 1014, 1024 (9th Cir.

2  2002).

3      "In this variety of Fourth Amendment case, alleging judicial

4  deception in the procurement of a search warrant, we confront a

5  situation where . . . a state-of-mind question is embedded in the

6  underlying constitutional issue, i.e., whether or not in allegedly

7  omitting relevant information from his affidavit in support of the

8  application for a search warrant," Messerschmidt acted "with

9  deliberate falsehood or reckless disregard for the truth." <u>Id.</u>

10 The question of "state of mind" is one of fact, while the question

11 of materiality, whether the warrant would have in fact been issued

12 in light of these false statements and/or omissions, is one of law

13 for the court. <u>Id.</u> at 1025-26.

14 *False Statements and/or Omissions*

15     The first question that this Court must answer is whether

16 there were, in fact, misrepresentations and/or omissions.

17 Plaintiffs first argue that Messerschmidt made a misrepresentation

18 by using the word "reside" or "residence" in the affidavit.

19 Plaintiffs acknowledge that the legal definition of residency may

20 be complicated, but argue that the basic concept is not.  In

21 support of their position, Plaintiffs point to the standard

22 dictionary definitions of "reside" and "resident."  Plaintiffs'

23 focus on the technical definition of these words is a red herring.

24 While Kelly may not actually have used the word "reside," she

25 confirmed that Bowen was "staying at" or "at" the 120th Street

26 Address.  At one point in particular during the interview, Kelly

27 confirmed without hesitation, after explaining that Bowen did not

28 live at the 97th Street Address, that he was at the 120th Street

1 Address - his foster mother's house.   (Mann Decl. Exh. C).

2 Considering all of the undisputed evidence in the light most

3 favorable to Plaintiffs, the Court finds that the terms "reside"

4 and "residence" are sufficiently ambiguous such that

5 Messerschmidt's use of them does not, as a matter of law, amount to

6 a false statement or a misrepresentation.[7]

7     The remainder of the misrepresentations and/or omissions of

8 which Plaintiffs complain relate to the fact that Messerschmidt

9 failed to include certain information in the affidavit.   For

10 instance, Plaintiffs point to the undisputed fact that

11 Messerschmidt did not include the actual words that Kelly used -

12 "staying at," "if I'm not mistaken," and "hiding out at."

13 Similarly, Plaintiffs contend that Messerschmidt misled the

14 magistrate by not including in the affidavit the undisputed fact

15 that his computer searches revealed, in addition to the 120th

16 Street Address, more recent and alternative addresses for Bowen.

17 Plaintiffs' argument is, in essence, that Messerschmidt misled the

18 magistrate by making unqualified statements without representing

19 all the facts. Therefore, these "misrepresentations" are more

20 properly characterized as omissions than false statements.   It is

21 undisputed that Messerschmidt had this information and did not

22 include it in the affidavit.   Therefore, these were omissions as a

23 matter of law.

24

25

26     ―――――――――――

27       [7]    Even if this did amount to a false statement, the Court
agrees with Defendants that Messerschmidt's use of the word

28 "reside" rather than "staying at" was reasonable, because both
clearly indicate the place where Bowen could be found.

*State of Mind*

Next, because the Court has found that there were omissions, it must address the question of whether Messerschmidt acted with "deliberate falsehood" or "reckless disregard for the truth." If he did not act dishonestly or recklessly, then Messerschmidt's actions were reasonable, and there was no constitutional violation. See Butler, 281 F.3d at 1024.  It appears that Plaintiffs' arguments regarding Messerschmidt's state of mind are that he had a duty to investigate further and that he knew, but failed to include, all of these facts.  Thus, Plaintiffs infer that, because Messerschmidt knew the facts and did not include them and because he could have easily investigated further, but did not, Messerschmidt must have acted with "deliberate falsehood or reckless disregard for the truth."  This is not enough to establish or make a "substantial showing" as to Messerschmidt's state of mind.

In support of their Motion, Defendants submit evidence that Messerschmidt reasonably excluded the information that his computer search revealed the 97th Street Address as Bowen's most recent address, because Kelly had told him, and he had verified, that Bowen was not living there.   (Messerschmidt Decl. ¶¶ 12 & 22). Defendants further argue, as discussed earlier, that Messerschmidt's use of the word "reside" rather than "staying at" or "hiding out at" was reasonable, because both clearly indicate the place where Bowen could be found.

The ultimate issue here is Messerschmidt's failure to qualify his statements with information that Kelly may have been something less than 100 percent certain as to Bowen's whereabouts and that

33

his computer searches revealed other addresses in addition to the 120th Street Address.   The Court reviewed the videotaped testimony of Shelly Kelly three times before it heard the words "if I'm mistaken."   Therefore, it is quite possible that Messerschmidt did not even hear Kelly say this.   Significantly, earlier in the interview, Kelly had indicated unequivocally and without hesitation, that Bowen was at the 120th Street Address.   (Mann Decl. Exh. C).   Additionally, Kelly had been Bowen's girlfriend for approximately six months at the time of the interview and, as a result, was in a position to have this information about him.   The 120th Street Address was that of Bowen's foster mother, someone with whom he presumably had a very close relationship.   Therefore, it was a logical place for Bowen to be staying, and was the most recent address for Bowen other than the 97th Street Address, where Messerschmidt knew Bowen was not staying.   Finally, at least one of the computer records searched indicated that, less than six months earlier, Bowen had, himself, reported the Millender Residence as his address.

Considering all of this undisputed evidence in the light most favorable to Plaintiffs, this Court finds that Messerschmidt acted reasonably as a matter of law.   Because Messerschmidt's conduct was reasonable, it did not violate Plaintiffs' constitutional rights as a matter of law, and it is unnecessary to reach the question of materiality.   Thus, as to Plaintiffs' federal claims for violation of 42 U.S.C. § 1983, the Court finds that, while there were omissions, Messerschmidt acted reasonably as a matter of law in making such omissions, such that there was no constitutional

1 violation.  Accordingly, Plaintiffs' Motion as it relates to this

2 issue is denied and Defendants' is granted.

3                          **(2)   *State Standard***

4      Plaintiffs argue that the same misstatements and/or omissions

5 discussed above also violate their right to be free from

6 unreasonable searches and seizures under the California

7 Constitution.[8]  While the facts discussed above apply equally to

8 this claim, the law under California state law is somewhat

9 different.  Furthermore, as the Parties' point out, the law varies

10 slightly depending on whether we are discussing misstatements or

11 omissions.  In the case of misstatements, People v. Cook, 22 Cal.

12 3d 67, 583 P.2d 130 (1978) provides the appropriate standard, while

13 in the case of omissions, People v. Kurland, 28 Cal. 3d 376, 618

14 P.2d 213 (1980) governs.  The Court has already determined that

15 there were no false statements in the affidavit.  Therefore, the

16 Court must only apply the law as it applies to omissions.

17      The Kurland court recognized that misstatements and omissions

18 may not be treated in an identical manner, because "[i]ntentional

19 omissions, unlike the intentional misstatements considered in Cook,

20 ─────────────────────

21      [8]    It should be noted that Plaintiffs do not assert claims
for violation of the California Constitution against any of the
22 Individual Defendants.  Rather, Plaintiffs name only the County of
Los Angeles as a Defendant in the following claims for violation of
23 state law:   (1) Count Four - Violation of California Constitution,
Article I, §§ 1,7, and 13; (2) Count Five - Violation of Civil Code
24 Section 52.1(b); (3) Count Six - Violation of Civil Code Section
51.7; and (4) Count Seven - Negligence (Civil Code § 1714).

25      Therefore, this analysis under state law is only relevant to
the extent that the question of whether Individual Defendants'
26 violated Plaintiffs' constitutional rights ultimately bears on the
question of whether the County is liable under *respondeat superior*.
27 Furthermore, to the extent Plaintiffs do attempt to allege state-
law claims against the Individual Defendants, they are precluded
28 from doing so by the allegations of their Complaint.

1 are not necessarily an effort to mislead the magistrate." _Id._ at
2 387. Rather, "[t]hey may arise from a correct, or at least
3 reasonable, conclusion that the omitted facts were immaterial or
4 privileged." _Id._ _Kurland_ sets forth a two-step process. First,
5 the reviewing court must determine whether any omissions asserted
6 are material, i.e., whether "their omission would make the
7 affidavit substantially misleading." _Id._ at 385, 387. Second,
8 "[i]f an omission is found material, the [fact-finder] must []
9 determine . . . whether it arose innocently or from culpable
10 conduct." _Id._ at 387. Specifically, it must be determined
11 "whether the material omission was either (1) reasonable, (2)
12 negligent, or (3) recklessly inaccurate or intentionally
13 misleading." _Id._ at 387-88. Furthermore, that "the omission
14 itself was 'intentional' rather than inadvertent may be relevant to
15 those issues, but may not alone be dispositive." _Id._ at 388.

16     Pursuant to _Kurland_, "[a] material omission is reasonable when
17 despite the exercise of due care, [the] affiant was ignorant of the
18 omitted fact or forgot to include it, or his conclusion that it was
19 privileged or immaterial was reasonable even if incorrect." _Id._
20 Where the material omissions are determined to be reasonable,
21 regardless of whether they were volitional or inadvertent, there is
22 no sanction and the warrant should be left in its original form.
23 _Id._ "Negligent omissions, on the other hand, occur when the
24 affiant is unreasonably ignorant of facts, unreasonably forgets to
25 include them, or makes a good faith but unreasonable decision that
26 they need not or should not be included." _Id._ In such a case, the
27 omissions should be added to the affidavit and it should be
28 retested for probable cause. _Id._ Finally, if an "affiant

36

1  intentionally omits any fact for the purpose of deceiving the
2  magistrate or recklessly disregards the accuracy and completeness
3  of the affidavit," the warrant should be quashed "regardless of
4  whether the omission ultimately is deemed material." Id. at 390.

5      The Court reaches the same determination under California law
6  that it reached under federal law.  As previously discussed,
7  Messerschmidt's decision to omit the facts at issue here was
8  reasonable as a matter of law.  Because the omissions were
9  reasonable, the Count need not reach the issue of materiality.
10  Accordingly, Plaintiffs' Motion as it relates to the claims
11  pursuant to the California Constitution is denied and Defendants'
12  Motion to the same effect is granted.

13          **3.   Qualified Immunity as to Messerschmidt**

14      Defendants have also moved for summary adjudication of the
15  issue on the grounds that Messerschmidt is entitled to qualified
16  immunity on the federal claims.[9]  Because the Court has already
17  determined that Messerschmidt acted reasonably and that there was
18  no constitutional violation, the issue of qualified immunity as it
19
20  _____

21      [9]   In their Opposition, Plaintiffs state that "[q]ualified
    immunity is not a defense to the Millenders' state law claims
22  (violations of the California Constitution , Article I, §§ 1, 7 &
    13, California Civil Code §§ 52.1(b) and 51.7, negligence and
23  conspiracy).  (Plaintiffs' Opp. at 14:26-15:1).  Specifically, they
    cite Ogborn v. City of Lancaster for the proposition that "[t]he
24  doctrine of qualified governmental immunity is a federal doctrine
    that does not extend to state court claims against government
25  employees."  101 Cal. App. 4th 448, 460 (2002).

26      Once again, this Court notes that Plaintiffs bring such state
    claims against the County only under a theory of respondeat
27  superior.  (See Complaint ¶¶ 27-31).  Thus, the Individual
    Defendants' arguments that they are entitled to qualified immunity
28  pertain only to the federal claims brought against them.

1  relates to probable cause to believe that Bowen could be found at

2  the Millender Residence is moot.

3      **C.   Nighttime Service**

4      Plaintiffs move this Court to summarily adjudicate the

5  question of whether the affidavit was insufficient to support

6  nighttime service.  Defendants also move for summary adjudication

7  of this issue, arguing that the facts in the affidavit did, as a

8  matter of law, justify nighttime service.

9      California Penal Code § 1533 provides as follows: "Upon a

10 showing of good cause, the magistrate may, in his or her

11 discretion, insert a direction in a search warrant that it may be

12 served at any time of the day or night.  In the absence of such

13 direction, the warrant shall be served only between the hours of 7

14 a.m. and 10 p.m."  Cal. Penal Code § 1533 (West 2000).  Section

15 1533 further states that "[w]hen establishing 'good cause' under

16 this section, the magistrate shall consider the safety of the peace

17 officers serving the warrant and the safety of the public as a

18 valid basis for nighttime endorsements." Id.

19      "The proper standard for 'good cause' as specified in Penal

20 Code section 1533 is as follows: the affidavit furnished the

21 magistrate must set forth specific facts which show a necessity for

22 service of the warrant at night rather than between the hours of 7

23 a.m. and 10 p.m."  Tuttle v. Superior Court, 120 Cal. App. 3d 320,

24 327-28 (1981) (citing People v. Watson, 75 Cal. App. 3d 592, 598

25 (1977)).  Furthermore, "[a]llegations in an affidavit with respect

26 to safety of officers must inform the magistrate of specific facts

27 showing why nighttime service would lessen a possibility of violent

28 confrontation, e.g. that the particular defendant is prepared to

1 use deadly force against officers executing the warrant." <u>Id.</u> at

2 239.

3        It is undisputed that the magistrate endorsed the warrant for

4 night service (Mann Decl. Exh. J at 88), and that the sworn

5 affidavit includes the following language in specific support of

6 Messerschmidt's request for night service:

7              Your Affiant request [sic] that this Search

8              Warrant be endorsed for night service due to

9              the fact that the investigation has shown that

10             the primary suspect in this case has gang ties

11             to the Mona Park Crip gang based on information

12             provided by the victim and the cal-gang

13             database.  Also your Affiant believes the

14             nature of the crime (Assault with a deadly

15             weapon) goes to show that night service would

16             provide an added element of safety to the

17             community as well as for the deputy personnel

18             serving the warrant, based on the element of

19             surprise.

20 (<u>Id.</u> at 97).  In deciding whether a nighttime search is justified,

21 a magistrate need not "rely solely upon the facts the affiant

22 expressly articulates as being those which justify nighttime

23 service."  <u>People v. Lopez</u>, 173 Cal. App. 3d 125, 138 (1985).

24 "Instead, the magistrate reviews the entire affidavit, as well as

25 any other evidence properly before him, in determining whether

26 sufficient specific facts exist which reveal a necessity for

27 nighttime service."  <u>Id.</u>  Thus, the following information which is

28 undisputedly included in the sworn affidavit, should also be

considered in determining whether night service was justified: (1)
that the alleged crimes were spousal assault and assault with a
deadly weapon (Mann Decl. Exh. J at 94); (2) that the suspect had a
violent temper and nature (<u>Id.</u>); (3) that the suspect had committed
"some previous physical assaults" on the victim (<u>Id.</u>); and (4) that
the suspect utilized a "black sawed off shotgun with a pistol grip"
in the commission of the crime, which he fired at the victim and/or
her car five times (<u>Id.</u> at 95).

Plaintiffs argue that this information was not enough to
justify night service because the allegations regarding officer
safety were not specific enough.  In particular, Plaintiffs argue
that the affidavit was insufficient, because it did not include
specific facts that Bowen was likely to use force *against officers*
as required by <u>Tuttle</u>.  In support of this argument, Plaintiffs
cite Messerschmidt's deposition testimony that he had "no specific
information . . . that Bowen would be a threat to the officers."
(Mann Decl., Exh. X at 120:11-121:18).  This argument is
unpersuasive.

<u>Tuttle</u> did not require that an affiant provide specific facts
or evidence of violence or a tendency of violence against officers.
The facts in the affidavit, that Bowen physically assaulted his
girlfriend, shot at his girlfriend with a black sawed-off shotgun,
had violent tendencies, had assaulted his girlfriend in the past,
and was a member of the Mona Park Crip gang, were sufficient to
show the likelihood that he would also use violence against
officers.

Plaintiffs further argue that the fact that deputies later
arrested Bowen at a motel during the day shows that night service

1 was not justified. However, the facts as to how Bowen's arrest was

2 ultimately achieved do not bear on whether the issuance of a

3 warrant for night service was justified. Plaintiffs' argument that

4 deputies went to the Millender Residence in broad daylight and

5 spoke with Mrs. Millender and Brenda is equally unavailing.

6      Finally, the cases upon which Plaintiffs rely in support of

7 their argument are not convincing. In <u>Tuttle</u>, unlike this case,

8 the only facts in the affidavit were the nature of the contraband

9 (marijuana) and the type of crime (cultivation). The only

10 reference to firearms was general in nature, that "instances of

11 escape and carrying of firearms are becoming more common in the

12 service of search warrants on remote cultivation sites in

13 California." <u>Tuttle</u>, 120 Cal. App. 3d at 328. None of the facts

14 included were specific to the suspect at issue. Plaintiffs also

15 cite <u>United States v. Nielson</u> for the proposition that Bowen's

16 affiliation with a "gang," and the fact that he was accused of

17 assaulting his girlfriend with a deadly weapon were insufficient to

18 justify night service. 415 F.3d 1195 (10th Cir. 2005). <u>Nielson</u>

19 does not support this proposition. In fact, the issue of night

20 service is not even mentioned in <u>Nielson</u>, which deals with the

21 question of whether police were justified in making a "no-knock"

22 entry to execute a warrant. <u>Id.</u>

23      Based on the foregoing, this Court finds that the facts

24 specified in the sworn affidavit were sufficient to justify

25 issuance of a warrant endorsed for night service. Accordingly,

26 this Court denies Plaintiff's Motion and grants Defendants' Motion

27 in this regard.

28

1          **D.    Probable Cause to Search For and Seize the Items**

2                **Specified in the Warrant**

3       Plaintiffs and Defendants each move for summary adjudication

4   on the question of whether the warrant established probable cause

5   to search for the items specified in the warrant. It is undisputed

6   that "Attachment 2" to the Search Warrant contained the following

7   language in regards to the property to be searched for and seized:

8                All handguns, rifles, or shotguns of any caliber,

9                or any firearms capable of firing ammunition,

10               or firearms or devices modified or designed to

11               allow it to fire ammunition.  All caliber of

12               ammunition, miscellaneous gun parts, gun cleaning

13               kits, holsters which could hold or have held any

14               caliber handgun being sought.  Any firearm for

15               which there is no proof of ownership.  Any

16               firearm capable of firing or chambered to fire

17               any caliber ammunition.

18

19               Articles of evidence showing street gang member-

20               ship or affiliation with any Street Gang to

21               include but not limited to any reference to

22               'Mona Park Crips,' including writings or

23               graffiti depicting gang membership, activity, or

24               identity.  Articles of personal property tending

25               to establish the identity of persons in control

26               of the premises.  Any photographs or photograph

27               albums depicting persons, vehicles, weapons or

28               locations, which may appear relevant to gang

1           membership, or which may depict the item being

2           sought and or believed to be evidence in the

3           case being investigated on this warrant, or

4           which may depict evidence of criminal activity.

5           Additionally to include any gang indicia that

6           would establish the persons being sought in this

7           warrant, affiliation or membership with the

8           'Mona Park Crips' street gang.

9   (Mann Decl. Exh. J at 91).

10       "In order for a search to be reasonable, the warrant must be

11  specific." In re Grand Jury Subpoenas Dated December 10, 1987, 926

12  F.2d 847, 856 (9th Cir. 1991). "Specificity has two aspects:

13  particularity and breadth." Id. "Particularity is the requirement

14  that the warrant must clearly state what is sought." Id. "Breadth

15  deals with the requirement that the scope of the warrant be limited

16  by the probable cause on which the warrant is based." Id.

17       Plaintiffs argue that the warrant was overbroad in that it

18  authorized the seizure of articles without probable cause to

19  believe such items were likely to be found in the Millender

20  Residence or were related to the crime at issue. In conjunction

21  with this argument, they contend that the warrant did not describe

22  the items to be seized with sufficient particularity.  In support

23  of their argument, Plaintiffs point to the undisputed facts that:

24  (1) according to the affidavit, Bowen was accused of assaulting

25  Kelly with a deadly weapon, a specifically-described black, sawed-

26  off shotgun with a pistol grip (Mann Decl. Exh. J at 94);(2)

27  Defendants knew exactly what the gun looked like because Kelly gave

28  them a photograph of Bowen with the gun (Id. at 95); (3) the

43

1  affidavit did not mention any other weapons or crimes (Id. at 88-

2  97); and (4) the affidavit did not assert that Bowen's alleged gang

3  membership had anything to do with the crime, and Messerschmidt

4  admitted that it did not. (Id.; Mann Decl. Exh. X at 119:9-120:10).

5  Based on these facts, Plaintiffs argue that the warrant authorizing

6  the seizure of "everything having to do with any weapon," "evidence

7  of any crime," and "any evidence of gang paraphanalia" was not

8  supported by probable cause.  (P's MSJ at 19:9-11).  Therefore,

9  Plaintiffs contend that Defendants should not have seized Mrs.

10 Millender's Mossberg shotgun or the .45 caliber ammunition and

11 should not have been looking through the Millenders' family

12 photograph albums.  (Id. at 11-13).

13      Plaintiffs further argue that the authorization to search for

14 "[a]rticles of personal property tending to establish the identity

15 of the person in control of the premise or premises" was

16 oppressively overbroad.  (Id. at 19:14-15; Mann Decl. Exh. J at

17 91).  First, Plaintiffs argue that evidence of "control of the

18 premises" was irrelevant, and would only be relevant if "one were

19 looking for a murder weapon but did not know who had used it" or if

20 "one were searching a house full of contraband."  (P's MSJ at 20:2-

21 7).  Plaintiffs contend that there was no question here of who used

22 the shotgun and that, even if there were, evidence of control of

23 the premises would not tie the gun to Bowen, only to Mrs.

24 Millender.  Plaintiffs further argue that it was quite apparent

25 that Defendants knew that Mrs. Millender was in control of the

26 home, because they did not take anything tending to show that;

27 rather, "they just used the warrant as an excuse to turn Mrs.

28 Millender's home upside down."  (Id. at 20:10-14).

1    Second, Plaintiffs argue that "[g]eneric classifications in a

2  warrant are acceptable only when a more precise description is not

3  possible." United States v. Hill, 459 F.3d 966, 976 (9th Cir.

4  2006).  Thus, Plaintiffs contend that, at the very least, "the

5  warrant should have authorized the seizure of evidence tending to

6  establish control of the black, sawed-off shotgun, if one were

7  found."  (P's MSJ at 20:21-23).

8    As an initial matter, the Court notes that, in making their

9  argument, Plaintiffs have made several misstatements.  First, the

10 warrant did not authorize the seizure of "everything having to do

11 with *any weapon*."  Rather, its authorization was limited to

12 firearms and things related to firearms, presumably on the grounds

13 that a firearm was used in the commission of the alleged crime.

14 (Mann Decl. Exh. J at 91).  Second, the warrant did not authorize

15 "evidence of any crime," but instead authorized seizure of "[a]ny

16 photographs or photograph albums . . . which may depict evidence of

17 criminal activity."  (Id.)  Therefore, to summarize, Plaintiffs'

18 chief complaints are that the warrant was overbroad in its

19 authorization of: (1) the seizure of all firearms and firearm-

20 related items; (2) the seizure of articles of evidence showing or

21 relevant to gang membership; and (3) the seizure of articles of

22 personal property tending to establish the identity of persons in

23 control of the premises.

24    The Ninth Circuit has made abundantly clear that "[t]he scope

25 of the warrant, and the search, is limited by the extent of the

26 probable cause," and that "probable cause must exist to seize all

27 the items of a particular type described in the warrant."  In re

28

1  <u>Grand Jury Subpoenas</u>, 926 F.2d at 857.  Therefore, this Court must

2  look at each of Plaintiffs' complaints.

3       First, as to Plaintiffs' contentions regrading the search for

4  firearms, it is undisputed that: (1) Bowen was accused of

5  assaulting Kelly with a specifically-described sawed-off shotgun;

6  (2) that Kelly gave Defendants a photograph of Bowen with the

7  shotgun; and (3) that the affidavit did not mention any other

8  weapons or crimes.  (Mann Decl. Exhs. C & J).  Defendants argue

9  that, even so, the warrant was reasonably specific, because "any

10 caliber of shotgun or receipts would show possession of and/or

11 purchase of guns."  (Defendants' Opp. at 18:28-19:1).  This

12 argument is nonsensical and unpersuasive.  The crime specified here

13 was a physical assault with a very specific weapon.  Therefore,

14 Defendants were not entitled to search for all firearms and the

15 warrant was overbroad in this respect.

16      Second, Plaintiffs argue that the authorization to seize gang-

17 related information was overbroad, because, as Messerschmidt

18 admitted, there was no evidence that the crime at issue was gang-

19 related.  (<u>See</u> Messerschmidt Depo. at 119:9-120:10).  In response,

20 Defendants make the unsupported statement that "[t]he photos sought

21 re gang membership could be linked with other gang members,

22 evidencing criminal activity as gang affiliation is an enhancement

23 to criminal charges."  (Defendants' Opp. at 19:1-3).  This argument

24 is unconvincing.  Plaintiffs are correct that California Penal Code

25 § 186.22(b)(1) limits gang enhancements to cases where the

26 underlying crime was gang-related.  Specifically, it states that

27 "any person who is convicted of a felony committed for the benefit

28 of, at the direction of, or in association with any criminal street

46

gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," may, at the court's discretion, be punished with an additional term of two to ten years depending on the nature of the underlying crime. Cal. Penal Code § 186.22(b)(1) (West Supp. 2007). Defendants do not point to any other basis for their argument or make any additional arguments. Therefore, this Court finds that the warrant was overbroad in its authorization to seize gang-related items.

Finally, Plaintiffs argue that the warrant was overbroad in its authorization to seize evidence of who controlled the premises, because such evidence was irrelevant in that Defendants already knew that the shotgun at issue was Bowen's and evidence of who controlled the premises would only tie the gun to Mrs. Millender and not to Bowen. The Court is not convinced. Plaintiffs acknowledge that evidence of who controlled the premises would be relevant "if incriminating evidence were found and it became necessary to tie that evidence to a person." (Plaintiffs' MSJ at 20:2-4). The mere fact that Defendants had a picture of Bowen with the shotgun and testimony of the victim, did not prevent them from, in an abundance of caution, seeking additional ways of tying Bowen to the weapon. In fact, failure to seek all potential evidence tying Bowen to the weapon would likely have subjected them to criticism as well. Finally, that Defendants may have known that Mrs. Millender owned the residence is irrelevant. Bowen, too, could have had control of the premises to some extent, such that he could have stored a weapon there. In fact, this explains why Defendants did not seize evidence that Mrs. Millender controlled the premises and only seized evidence that *tended to establish* that

1  Bowen controlled the premises.[10]  Therefore, the Court finds that,

2  as a matter of law, the warrant was not overbroad in respect to its

3  authorization to seize evidence tending to establish who controlled

4  the premises.

5       Defendants contend, though, that even if it was overbroad, the

6  warrant was valid, because "[a]n affidavit providing more guidance

7  than an overbroad warrant may cure the warrant's overbreadth" if

8  "(1) the warrant expressly incorporated the affidavit by reference

9  and (2) the affidavit either is attached physically to the warrant

10 or at least accompanies the warrant while agents execute the

11 search."  United States v. Bridges, 344 F.3d 1010, 1018 (9th Cir.

12 2003).  In support of this argument, Defendants point to the

13 language of Attachment 2, which is set out above.  That language is

14 the very "overbroad" language to which Plaintiffs are referring

15 and, therefore, does nothing to cure the warrant.

16      The Court notes that the Search Warrant does specifically

17 incorporate Messerschmidt's "Statement of probable cause" which

18 includes specific information about the crime at issue, the weapon

19 used, Bowen's gang membership, etc. (Mann decl. Exh. J at 88, 94-

20 97).  However, Defendants make no effort to explain how such

21 Statement cures the warrant's overbreadth, and this Court finds

22 that, as a matter of law, it does not.

23 ────────────────────

24      [10]    Plaintiffs note that Defendants did seize a letter
   addressed to Bowen, which they claim was not authorized, because it
25 did not tend to establish who was "in control of the premises."
   Specifically, they argue that not everyone who receives mail at a
26 location is in control of that location.  While this may be true,
   this Court disagrees with Plaintiffs' assertion.  Although
27 ultimately it may be determined that a person receiving mail at a
   certain address was not in control of the premises, the receipt of
28 mail at a certain location certainly may tend to establish such
   control.

48

1    Accordingly, this Court grants Plaintiff's Motion for Summary

2  Adjudication on the issue of the overbreadth of the warrant as it

3  relates to its authorization to seize all firearms and firearm-

4  related items and all gang-related evidence.  However, the Court

5  grants Defendants' Motion for Summary Adjudication as it relates to

6  the authorization to seize evidence tending to establish the

7  identity of persons in control of the premises.

8    **E.    Knock and Announce/Unlawful Entry**

9    Plaintiffs next argue that, as a matter of law, Defendants

10 violated California Penal Code § 1531, the California Constitution

11 and the Fourth Amendment to the United States Constitution, because

12 they broke into the Millender Residence without giving Plaintiffs

13 an opportunity to open the door.  Defendants, on the other hand,

14 argue that the entry was lawful and that they are entitled to

15 summary adjudication in that regard.

16    "The Fourth Amendment to the Constitution protects '[t]he

17 right of the people to be secure in their persons, houses, papers,

18 and effects, against unreasonable searches and seizures.'" <u>Wilson</u>

19 <u>v. Arkansas</u>, 514 U.S. 927, 931 (1995).  The "common-law 'knock and

20 announce' principle forms a part of the reasonableness inquiry

21 under the Fourth Amendment," such that "the reasonableness of a

22 search of a dwelling may depend in part on whether law enforcement

23 officers announced their presence and authority prior to entering."

24 <u>Id.</u> at 929, 931.  Nevertheless, not "every entry must be preceded

25 by an announcement" and "breaking is permissible in executing an

26 arrest under certain circumstances."  <u>Id.</u> at 934 (internal

27 citations omitted).  "An officer's noncompliance with the knock and

28 announce rule is excused . . . if exigent circumstances exist."

1  United States v. Reilly, 224 F.3d 986, 991 (9th Cir. 2000).

2  "Exigent circumstances are 'circumstances that would cause a

3  reasonable person to believe that entry was necessary to prevent

4  physical harm to the officers or other persons, the destruction of

5  relevant evidence, the escape of the suspect, or some other

6  consequence improperly frustrating legitimate law enforcement

7  efforts.'"   Id. (internal citations omitted).   "The determination

8  of exigent circumstances is a mixed question of law and fact."   Id.

9       Similarly, under California law, "[t]he officer may break open

10 any outer or inner door or window of a house, or any part of house,

11 or anything therein, to execute the warrant, if, after notice of

12 his authority and purpose, he is refused admittance."   Cal. Penal

13 Code § 1531 (West 2000).   "An unreasonable delay in responding to a

14 knock and announce is tantamount to a refused admittance."   People

15 v. Hoag, 83 Cal. App. 4th 1198, 1207 (2000).       Defendants

16 contend that they were entitled to "break in," because they were

17 refused admittance.   Plaintiffs, however, argue that this Court

18 should reject such claim, because it is undisputed that Defendants

19 did not give Plaintiffs sufficient time to open the door.   Both

20 Parties submitted an audio recording of the entry, which they agree

21 took place at approximately 5:00 in the morning.   (Mann Decl. Exh.

22 L; Declaration of Scott William Walker ("Walker Decl."), ¶¶ 12 and

23 27 and Exh. AA attached thereto).

24      Based on that audio recording, Plaintiffs argue that

25 Defendants began breaking in as soon as the pre-recorded

26 announcement began to play.   (Mann Decl. Exh. L).   Walker states

27 that the SWAT team personnel provided knock-notice both verbally

28 and by way of a public address system, and that, after the

1  occupants failed to comply with notice and waiting a reasonable

2  amount of time, the team made a forcible entry.  (Walker Decl. ¶¶

3  13 & 14).  Defendants claim that the length of time between the

4  knock/notice and entry was reasonable, because Walker received

5  information that there was a light on and movement in the house.

6  (Id. at ¶ 12).  Defendants further claim that approximately 20

7  seconds elapsed from the time Walker asked for the pre-recorded

8  announcements to be started to the time when they actually gained

9  entrance into the residence after porting the window and breaking

10 the door.  (Id. at ¶ 14).  In response to Walker's estimate of

11 time, Plaintiffs correctly argue that Walker's "stop" and "start"

12 points are wrong.  "The proper trigger point . . . is when those

13 inside should have been alerted that the police wanted entry to

14 execute a warrant."  United States v. Smith, 63 F.3d 956, 962 (10th

15 Cir. 1994).  Furthermore, common sense and the policy behind the

16 knock and announce requirement of avoiding needless destruction of

17 private property, dictate that the "ending point" should be the

18 point at which Defendants began the forcible entry.  See Hoag, 83

19 Cal. App. 4th at 1211; see also United States v. Chavez-Miranda,

20 306 F.3d 973, 980 (9th Cir. 2002).

21      After listening to the audio tape, this Court finds that the

22 forcible entry began somewhere between 2 and 9 seconds after the

23 announcements began playing (and between 5 and 12 seconds after

24 Walker called for the announcements).  (Mann Decl. Exh. L; Walker

25 Decl. Exh. AA).  It is impossible to determine from the audio

26 recording exactly when the "breaking in" began.  However, banging

27 of some sort can be heard no more than 2 seconds after the

28 announcements began, deputies were ordered to "break and rake"

51

1  (meaning break the front window) 5 seconds after the announcements
2  began, and the window can be heard breaking 9 seconds after
3  announcements began.  (<u>Id.</u>)  The first verbal announcements that
4  can be heard (aside from the pre-recorded announcements from the PA
5  system) come at approximately the same time as the window can be
6  heard breaking.  (<u>Id.</u>)  Walker states, however, that several verbal
7  announcements were made before he ordered the deputies to "break
8  and rake."  (Walker Decl. ¶ 13).  In listening to the audio tape,
9  background noises including voices can be heard at certain points,
10 but it is impossible to ascertain what exactly is being said.
11 Therefore, considering the evidence in the light most favorable to
12 the non-moving party (in the case of Plaintiffs' Motion), it is
13 possible that additional announcements were made, which cannot be
14 heard on tape.  Finally, the announcement that the doors were open
15 came approximately 13 seconds after the pre-recorded announcements
16 began.  (<u>Id.</u>)

17      While it is true that "[t]here is no established time that the
18 police must wait" in order to constructively infer refused
19 admittance, "the lapse of time must be reasonable considering the
20 particular circumstances of the situation."  <u>Chavez-Miranda</u>, 306
21 F.3d at 980.  "When evaluating reasonableness, we consider such
22 circumstances as (1) the size and layout of the residence; (2) the
23 time of day; (3) the nature of the suspected offense; (4) the
24 evidence demonstrating guilt; and (5) the officers' other
25 observations that would support forced entry."  <u>Id.</u>  While it is
26 undisputed that members of the entry team drove by the Millender
27 Residence two days before the execution of the warrant and took
28 photographs, there is no evidence that they knew anything about the

1   layout of the house.  Therefore, this information cannot be applied

2   in this case in order to determine how long officers should

3   reasonably have waited before entering forcibly.  As for the time

4   of day, it is reasonable to believe that, at 5:00 a.m. the

5   occupants would be asleep.  On the other hand, it is not unheard of

6   that people begin to wake up at this time of day in order to get

7   ready for work.  Therefore, this information is likewise not

8   particularly helpful in this case.  Defendants, however, present

9   evidence of the final three factors in support of their position.

10       As to the "nature of the suspected offense" and the "evidence

11  demonstrating guilt," it is undisputed that the underlying crime

12  was assault with a deadly weapon, namely a sawed-off shotgun, and

13  that the victim of the alleged crime specifically testified to that

14  fact. (Mann Decl. Exhs. C & J).  The victim also testified to the

15  facts that Bowen had violent tendencies and had assaulted her on

16  prior occasions.  (Mann Decl. Exh. J).  Finally, it is undisputed

17  that Bowen had a violent history including multiple felony and

18  misdemeanor arrests involving weapons (Messerschmidt Decl. ¶ 11,

19  Exh. G), was a three-strike candidate (Messerschmidt Decl. ¶ 25),

20  and was a known member of the Mona Park Crips gang. (Id.; Mann

21  Decl. Exhs C & J).

22       Additionally, Defendants argue that there was other evidence

23  to support forced entry in that, as the entry team was approaching

24  the house, a member of the containment team communicated by radio

25  that he saw a light on and movement in the back of the house.

26  (Walker Decl. ¶ 12; Deposition of Rick O'Neill Rector, August 2,

27  2006 ("Rector Depo."), Exh. U to Declaration of Eugene Ramirez

28  ("Ramirez Decl."), 62:4-63:5; Deposition of John Stuart Bones,

August 1, 2006 ("Bones Depo."), Exh. W to Ramirez Decl. at 38:12-
39:21, 41:1-23, 43:1-3; Deposition of Brice Alan Stella, August 3,
2006 ("Stella Depo."), Exh. X to Ramirez Decl., 55:19-23; County of
Los Angeles Sheriff's Department Supplemental Report, attached as
Exh. KK to Ramirez Decl.).  Officer Bones specifically testified
that he was the deputy who radioed, indicating that he saw movement
at the back of the house.  (Bones Depo. at 38:12-39:21, 41:1-23).
He could not remember whether he also reported seeing light.  (Id.
at 43:1-3).  At least three other deputies also testified that this
communication was made.  Based on this information, Walker inferred
that someone was up and moving, potentially Bowen. He considered
the possibility that the historically violent suspect would have
the opportunity to arm himself,[11] and the safety of officers and
other residents.  Therefore, in his opinion, the circumstances
became exigent.  (Walker Decl. ¶ 12).

The supplemental report regarding the service of the search
warrant states that "when there was no response from the interior
of the main house and when containment personnel began to see
movement in the addition on the east side of the house, Deputies .
. . began to try to force upon the front security door."  (Ramirez
Decl. Exh. KK).  However, Plaintiffs point out that this
information was not included in the Team Activation Packet, which
simply states the reason for forcible entry as refused admittance.
(Mann Decl., Exh. K).  Similarly, the communication was not

---

[11]    "[I]f an occupant is predisposed to resist an entry by
police, a substantial delay between announcement and entry could
only give him time to prepare."  (People v. Trujillo, 217 Cal. 3d
1219, 1227 (1990)(citing People v. Tacy, 195 Cal. App. 3d 1402,
1420(1987)(quoting Bustamante-Gamez, 488 F.2d at 11).

1 recorded or documented by the deputy whose job it was to document

2 everything on the radio log. (Cook Decl. Exh. GG).

3 　　While Defendants argue that this justified the forcible entry

4 as a matter of law, Plaintiffs contend that generic movement,

5 without more, is not enough. See People v. Trujillo, 217 Cal. App.

6 3d 1219, 1226-27 (1990). This Court notes, however, that, in

7 Trujillo, the court specifically mentioned that the movement could

8 have been a dog whereas here Bones specifically testified that the

9 movement was "human." Furthermore, the policy behind the knock and

10 announce rule of preventing injury to the police or citizens who

11 would react aggressively to a surprise entry is served when the

12 police actually announce their presence. Id. at 1227. Even so,

13 this Court finds that it is unable to reach a decision at this time

14 as to whether or not the forced entry was reasonable as a matter of

15 law. There are genuine issues of material fact that bear on this

16 decision including, for instance, whether the "movement" appeared

17 to be based upon knowledge of the Sheriff's Department's presence,

18 what exactly the movement was and when exactly it occurred, when

19 exactly Defendants began breaking in versus simply banging on the

20 door, why the communication regarding movement at the back of the

21 house was not documented in all relevant places, and the exact

22 timing of various actions by deputies. The Court finds that these

23 facts and others are in dispute and that it is necessary to hear

24 testimony from the parties and witnesses in order to provide

25 further information and to assess credibility.[12] Accordingly, this

26 ───────────────

27 　　　[12]　　The Court notes that the Parties also submitted an
expert report and deposition testimony indicating that the entry
28 team acted reasonably in executing the warrant. The Court's
(continued...)

1 Court denies both Plaintiffs' and Defendants' Motions regarding the

2 lawfulness of the entry.

3   **F.   Qualified Immunity for Individual Defendants**

4       In a suit against an officer for an alleged violation of a

5 constitutional right, the court must consider, as a threshold

6 matter, whether the officer is entitled to qualified immunity.   See

7 Saucier v. Katz, 533 U.S. 194, 200 (2001).   Qualified immunity is

8 "an immunity from suit rather than a mere defense to liability."

9 Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).   The

10 first inquiry under a qualified immunity defense is whether the

11 facts alleged, in the light most favorable to plaintiff, show the

12 officer's conduct violated a constitutional right.   See id. at 201.

13 If no constitutional right would have been violated, then the

14 inquiry ends, and the defendant is entitled to qualified immunity.

15 See id.   Assuming the plaintiff clears the first hurdle of the

16 qualified immunity defense, the second inquiry is whether the right

17 was clearly established.   Id.   "The contours of the right must be

18 sufficiently clear that a reasonable official would understand that

19 what he is doing violated that right."   Id.   The inquiry is whether

20 it would be clear to a reasonable officer that his conduct was

21 unlawful in the situation he confronted.   See id.   Therefore, "law

22 _____

23   [12]   (...continued)
opinion was not influenced in either direction by that evidence.

24 Nevertheless, this evidence may be relevant in making a final
determination.

25       Similarly, Plaintiffs make the argument that there was

26 "evidence of improper motivation" on the part of Defendants,
because when they visited the Millender Residence prior to the

27 search, they allegedly "laughed" when Mrs. Millender told the
deputies that they could come in if they had a warrant.   This is

28 not undisputed evidence, but could impact the ultimate decision as
to reasonableness.

1 enforcement officers are entitled to qualified immunity if they act

2 reasonably under the circumstances, <u>even if</u> the actions result in a

3 constitutional violation." <u>Wilson v. Layne</u>, 526 U.S. 603, 614

4 (1999).

5     The Individual Defendants move this Court for summary judgment

6 on the issue of qualified immunity as it relates to each of

7 Plaintiffs' federal claims against them.

8            **1.   Probable Cause to Believe that Bowen Would be Found**

9                   **at the Millender Residence**

10     In addressing the issue of whether the affidavit established

11 probable cause to believe that Bowen would be found at the

12 Millender Residence, this Court determined that the affidavit was

13 valid as a matter of law.  Thus, there was no constitutional

14 violation in this respect.  Accordingly, all Individual Defendants

15 are entitled to qualified immunity as a matter of law, and

16 Defendants' Motion to such effect is granted.

17            **2.   Nighttime Service**

18     In this Order, the Court has already considered the question

19 of whether the facts specified in the affidavit were sufficient to

20 justify issuance of a warrant endorsed for night service.  In doing

21 so, the court concluded that, as a matter of law, the affidavit was

22 sufficient in this respect and that, therefore, there was no

23 resulting constitutional violation.  Accordingly, all Defendants

24 are entitled to qualified immunity, as a matter of law, and

25 Defendants' Motion to such effect is granted.

26

27

28

### 3.   Probable Cause to Search For and Seize the Items Specified in the Warrant

Once again, this Court has already considered the question of whether the warrant established probable cause to search for the items specified in the warrant.  In doing so, this Court determined that the warrant was overbroad in its authorization to seize all firearms and firearm-related items and gang-related items. Defendants made no additional arguments as to why, even if the warrant was overbroad, the officers acted reasonably, without knowing that what they were doing was wrong.  However, it is undisputed that the SWAT Defendants did not participate in the actual search for and seizure of evidence.  (Walker Decl. ¶¶ 19-21, 24).  Therefore, the SWAT Defendants are entitled to qualified immunity.  Accordingly, Defendants' Motion is granted as it relates to SWAT Defendants and denied as it relates to the remaining Individual Defendants.

### 4.   Unlawful Entry/Knock and Announce

Defendants assert that the SWAT Defendants are entitled to qualified immunity on Plaintiffs' claims for unlawful entry, because they did comply with the knock/notice requirements and, even if there was a constitutional violation, they acted reasonably under the circumstances.  Once again, the Court has discussed the issue of unlawful entry in detail and determined that questions of fact remain on a number of issues, including the alleged "movement" in the back of the house just prior to execution of the warrant. As previously discussed, these issues also go to the "reasonableness" of the SWAT Defendants' actions in the case that a constitutional violation is found.  Therefore, facts material to

1  the question of qualified immunity are in dispute.  Accordingly,
2  this Court denies Defendants' Motion as it relates to the SWAT
3  Defendants.

4       The Court further notes that it is unable to find any specific
5  allegations in regards to the other Individual Defendants, namely
6  Messerschmidt and Lawrence, on the unlawful entry claim.
7  Therefore, Defendants Motion on the grounds of qualified immunity
8  is granted as it relates to Defendants Messerschmidt and Lawrence.

9          **5.   Unreasonable Detention/Excessive Force**

10      Plaintiffs assert that, during the search, Defendants
11  illegally detained them in violation of their constitutional
12  rights, (Complaint ¶ 18), and that Defendants subjected Plaintiffs
13  to excessive force including but not limited to pointing firearms
14  at them.  (Id. at ¶ 19).  Individual Defendants argue that they are
15  entitled to qualified immunity because their detention of
16  Plaintiffs was reasonable, and they did not use excessive force.
17  In support of this contention, Individual Defendants rely on
18  Muehler v. Mena, 544 U.S. 93 (2005).  In Mena, the United States
19  Supreme Court held that "officers executing a search warrant []
20  have the authority to detain the occupants of the premises while a
21  proper search is conducted."  Id. at 98 (internal citations and
22  quotations omitted).  The Court further explained that "the
23  detention of an occupant is surely less intrusive than the search
24  itself, and the presence of a warrant assures that a neutral
25  magistrate has determined that probable cause exists to search the
26  home."  Id.  Therefore, such detentions are appropriate "because
27  the character of the additional intrusion caused by the detention
28

1 is slight and because the justifications for detention are

2 substantial." Id.

3      Following is Plaintiffs' opposition in its entirety:

4          The Millenders claim their detention was

5          unreasonable because there was no probable

6          cause to support the warrant in the first

7          place, and because defendants failed to

8          give proper knock-notice before breaking

9          into the house. *Muehler v. Mena*, 544 U.S.

10          93 (2005), is distinguishable. Being

11          required to stay outside for two hours in

12          the cold without being able to use the

13          bathroom was unreasonable.

14 (Plaintiffs' Opp. at 13:18-23). Plaintiffs first argument,

15 therefore, is that Plaintiffs' detention was unreasonable as a

16 matter of law (and, regardless of the particular facts), because

17 there was no probable cause to support the warrant in the first

18 place, and because the Entry Team violated established "knock and

19 announce" rules. Plaintiffs are correct that Mena presupposes a

20 valid warrant. Here, though, the Court has already determined that

21 there was probable cause to believe that Bowen was at the Millender

22 Residence and that, therefore, the warrant was valid. Furthermore,

23 that a triable issue of fact remains as to whether the entry was

24 unlawful does not bear on the reasonableness of the detention.

25 Plaintiffs, themselves, argue that they were not given sufficient

26 time to answer the door before Defendants broke in. Thus, it is

27 clear that Defendants ultimately would have gained entry to the

28 Millender Residence, and Plaintiffs would have been detained.

1    Plaintiffs' second argument in opposition to Defendants'

2  Motion is that the detention was unreasonable, because Plaintiffs

3  were required to stay outside for two hours in the cold without

4  being able to use the bathroom.

5    In Mena, the court held that officers executing a search

6  warrant may detain the occupants of the premises while conducting a

7  proper search.  Id. at 98.  In reaching this decision, the court

8  also held that officers may use reasonable force to effectuate the

9  detention, including the use of handcuffs.  Id.  Thus, in Mena, a 2

10 to 3 hour detention in handcuffs was reasonable.  This was

11 particularly true where the "governmental interests in not only

12 detaining, but using handcuffs, are at their maximum" because "a

13 warrant authorizes a search for weapons and a wanted gang member

14 resides on the premises."  Id. at 100.

15    It is undisputed that, while they were not allowed to retrieve

16 shoes or coats, Plaintiffs were allowed to sit in patrol cars for

17 the majority of this time and were given blankets.  One deputy even

18 turned on the heat for Johnson.  Furthermore, in reviewing the

19 audio tape of the entry, it appears to the Court that the SWAT

20 Defendants were very courteous to Plaintiffs.  Plaintiffs do not

21 argue otherwise.  It is also undisputed that SWAT Defendants only

22 pointed their weapons at or in the direction of Plaintiffs for a

23 short period of time, while they were clearing and securing the

24 premises.  While Johnson was handcuffed for at least a portion of

25 the time, Plaintiffs have not pointed to evidence of injury.

26 Furthermore, as provided in Mena, Defendants were entitled to

27 handcuff Plaintiffs during the search.  It is also undisputed that

28 the suspect sought was, in fact, a known gang member.

1       Plaintiffs complain about the amount of time they were
2  required to stay outside.  There is some dispute on this issue.
3  Defendants appear to argue that Plaintiffs were allowed to come
4  into the living room once the main and back houses were secured,
5  which was approximately 45 minutes after the initial entry.
6  However, Plaintiffs argue that they were required to remain outside
7  for almost two hours.  Even if Plaintiffs are correct, this was not
8  unreasonable considering that Plaintiffs were allowed to sit in
9  patrol cars and were given blankets.  Furthermore, it is undisputed
10 that Plaintiffs were ultimately brought back into the house while
11 the search was still being conducted.

12      Additionally, Plaintiffs focus on the fact that Mrs. Millender
13 was not allowed back into the house to go to the bathroom.  Mrs.
14 Millender simply testifies that she told an officer that she needed
15 to use the restroom, and he told her that she could not go back
16 into the house.  Therefore, in her words, she "couldn't do anything
17 but use the restroom in the street."  (Augusta Millender
18 Deposition, April 14, 2006, (A. Millender Depo.), 51:14-21, Exh. U
19 to Mann Decl.).  Defendants present testimony, however, that she
20 was told she would be able to go into the house and use the
21 restroom as soon as the house was secured.  While neither party
22 points to evidence of timing, Augusta Millender's deposition
23 testimony appears to be that she made her request approximately 30
24 minutes after she was taken outside (approximately 5:30 a.m.).  It
25 is undisputed that the SWAT Defendants did not finish securing the
26 residence until approximately 5:45 a.m.  Therefore, it was not
27 unreasonable for Defendants to require Mrs. Millender to wait until
28 the house was secure, before returning to use the restroom.  It

1 would have been unsafe to allow Mrs. Millender back into the house,

2 before it had been secured.

3     Therefore, considering all of the evidence presented in the

4 light most favorable to Plaintiffs, this Court finds that, as a

5 matter of law, Defendants' detention of Plaintiffs was not

6 unreasonable.  Accordingly, Individual Defendants are entitled to

7 qualified immunity in this respect, and Individual Defendants'

8 Motion on this issue is granted.

9         **6.   Unreasonable Destruction of Property**

10     Defendants next argue that they are entitled to qualified

11 immunity on the issue of wrongful or unreasonable destruction of

12 property.  It is undisputed that, at the very least, the following

13 property was damaged in the execution of the search warrant: (1)

14 "Metal security door, bent down the center with two holes, in the

15 screen, towards the locking mechanism";(2) "4'-6' plate glass

16 window, broken"; and (3) "Wooden door jam and locking plate,

17 splintered and broken."  (Ramirez Decl. Exh. KK).  In their

18 Opposition, Plaintiffs contend that Defendants made a mess of the

19 house, broke down a bedroom door even though the other door to the

20 same bedroom was open, and broke the front door and the living room

21 picture window.

22     Nevertheless, Defendants argue that they acted reasonably

23 because "officers executing a search warrant occasionally must

24 damage property in order to perform their duty."  <u>Dalia v. United</u>

25 <u>States</u>, 441 U.S. 238, 258 (1979).  They contend that "only

26 unnecessarily destructive behavior, beyond that necessary to

27 execute a warrant effectively, violates the Fourth Amendment."

28 <u>Mena v. City of Simi Valley</u>, 226 F.3d 1031, 1041 (9th Cir. 2000).

1    Defendants are correct that not all destruction of property

2 violates the Fourth Amendment.  However, this Court has ruled that

3 questions of fact exist as to whether the SWAT Defendants violated

4 knock and announce requirements.  Therefore, it logically follows

5 that, questions of fact exist as to whether SWAT Defendants acted

6 reasonably in regards to the destruction of property.  In other

7 words, if the SWAT Defendants are not entitled to qualified

8 immunity on the unlawful entry claim, then they cannot be entitled

9 to qualified immunity on the destruction of Plaintiffs' plate glass

10 window.  Thus, Defendants Motion in this regard is denied.

11    Plaintiffs, however, have not made any allegations against the

12 remaining Individual Defendants other than, potentially, that they

13 "made a mess of the house."  Plaintiffs do not provide anything

14 more concrete.  As unfortunate as it is, searches often result in

15 messes being made, and this alone does not amount to unreasonable

16 destruction of property.  Therefore, this Court finds that the

17 remaining Individual Defendants, namely Messerschmidt and Lawrence,

18 are entitled to qualified immunity. Therefore, Individual

19 Defendants' Motion in this respect is granted as to Messerschmidt

20 and Lawrence only.

21         **7.   Conspiracy**

22    In support of their argument that they are entitled to

23 qualified immunity on Plaintiffs' conspiracy claim, Individual

24 Defendants make the bare assertion that:

25         Defendants conspired to deprive them of

26         their Fourth Amendment rights. (Count 1.)

27         The conspiracy claim fails as there is no

28         evidence of an underlying constitutional

1  violation.

-2  (ID's MSJ at 24:18-21).  However, this Court has found that

3  questions of fact exist as to whether there is an underlying

4  constitutional violation. Because Defendants fail to make any

5  further arguments regarding the conspiracy claim, summary judgment

6  is not warranted at this time.

7    G.    **Monell** Claims

8    In Count Three of their Complaint, Plaintiffs assert that

9  "[a]ny governmental entity defendant and any police supervisorial

10 defendant is liable to each plaintiff for all wrongs alleged" in

11 the Complaint under Monell v. New York Dept. of Social Services,

12 436 U.S. 658 (1978).  More specifically, Plaintiffs allege that:

13         Defendants County of Los Angeles, Los Angeles

14         County Sheriff's Department, Leroy Baca and Does

15         are alleged to have maintained or permitted an

16         official policy or custom or practice causing or

17         permitting the occurrence of the types of wrongs

18         set forth herein below knowingly, with gross negligence,

19         or with deliberate indifference and,

20         based on the principles set forth in *Monell v.*

21         *New York City Department of Social Services*, 436

22         U.S. 658 (1978), and *City of Canton v. Harris*,

23         489 U.S. 378 (1989), are liable for all injuries

24         sustained by any plaintiff as set forth herein

25         below.

26 (Complaint ¶ 10).

27    In order to sustain their Monell claims against the Municipal

28 Defendants under 42 U.S.C. 1983, Plaintiffs must show that

1   Municipal Defendants had in effect a custom, policy, or practice
2   that caused a violation of their federal constitutional rights.
3   <u>Monell</u>, 436 U.S. at 691, 694.  Evidence of a single alleged
4   constitutional violation cannot establish a custom, policy or
5   practice under <u>Monell</u>.  <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-
6   24 (1985); <u>Nadell v. Las Vegas Metropolitan Police Dept.</u>, 268 F.3d
7   924, 929-30 (9th Cir. 2001).  "Several requirements must be
8   satisfied for a municipality to incur liability.  First, the injury
9   must amount to a constitutional deprivation." <u>Jackson v. Gates</u>,
10  975 F.2d 648, 654 (9th Cir. 1992).  "Second, the municipality will
11  be held to have caused an injury only when the acts which produce
12  it were sanctioned by the municipality." <u>Id.</u>  Finally, "[t]he
13  third requirement specifies that only municipal officials who have
14  'final policy-making authority' may, by their actions, subject the
15  municipality to § 1983 liability." <u>Id.</u>  (quoting <u>Pembaur v. City</u>
16  <u>of Cincinnati</u>, 475 U.S. 469, 480 (1986)).

17       Plaintiffs ask this Court to summarily adjudicate the question
18  of whether Defendants acted pursuant to custom, practice and
19  policy.  Municipal Defendants, on the other hand, move for summary
20  judgment on the <u>Monell</u> claims on the following grounds: (1)
21  Plaintiffs cannot establish <u>Monell</u> liability against them because
22  they have failed to identify or present evidence of a
23  constitutionally infirm policy; (2) Municipal Defendants cannot be
24  held liable, because Individual Defendants did not commit any
25  constitutional violations; (3) Municipal Defendants cannot be held
26  liable, because Individual Defendants are entitled to qualified
27  immunity; and (4) Sheriff Baca is not a proper Defendant.
28

1          **1.    Whether the Individual Defendants Acted Pursuant to**

2                  **Custom, Practice or Policy**

3          In support of their Motion, Plaintiffs contend that competent

4   testimony that the conduct in question was in accord with or

5   pursuant to the entity's customs, practices or policies is direct

6   evidence of the entity's customs, practices or policies.  <u>See</u>

7   <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 961-62 (9th Cir.

8   2000); <u>see</u> <u>also</u> <u>Clipper v. Takoma Park, Maryland</u>, 876 F.2d 17 (4th

9   Cir. 1989).  In both of these cases, the court determined that

10  evidence that an officer believed his actions were in accordance

11  with custom, practice, and policy was relevant to the plaintiff's

12  <u>Monell</u> claims.  Furthermore, Plaintiffs argue that "ratification"

13  is also evidence of custom, practice and policy.  <u>See</u>, <u>e.g.</u>,

14  <u>McRorie v. Shimoda</u>, 795 F.2d 780, 784 (9th Cir. 1986) (stating that

15  "[p]olicy or custom may be inferred if," after the questioned

16  action, officials "took no steps to reprimand" or "otherwise failed

17  to admit . . . conduct was in error.")  Therefore, Plaintiffs

18  submit evidence that the Individual Defendants have acknowledged

19  that their actions were in accordance with Department policy and

20  claim they acted properly.  Specifically, Plaintiffs point to the

21  following testimony:

22      •    Messerschmidt's testimony that as far as he was aware his

23           investigation was done and his affidavit written in

24           accordance with the training he received, and that no one

25           ever told him otherwise.  (Messerschmidt Depo. at 140:15-

26           24);

27      •    Walker's testimony that the actions he took prior to the

28           execution of the warrant were in accordance with the

1       training he received, that no one ever told him

2       otherwise, and that his training has not changed since

3       then.   (Walker Depo. at 137:19-138:22);

4   •   Walker's testimony that the actions he took in "forcing

5       entry" into the Millender Residence (including the amount

6       of time he waited after the announcements, pointing a

7       firearm at Plaintiffs, searching for people, and

8       reporting of the warrant execution) were in accordance

9       with his training and no one ever told him otherwise.

10      (_Id._ at 138:23-140:25);

11  •   Rector's testimony that his scouting of the Millender

12      Residence, contact with the Millenders on the day before

13      the search, forced entry into the Millender Residence,

14      amount of time waited before breaking in, pointing of

15      firearm in specific manner, and documentation of the

16      execution were in accordance with the training he

17      received and that no one ever told him otherwise.

18      (Rector Depo. at 98:5-99:17);

19  •   Stella's testimony that his scouting, contact with the

20      men shooting dice, forced entry, amount of time waiting

21      before entering, search for people, and reporting were in

22      accordance with the training he received and that no one

23      ever told him otherwise.   (Stella Depo. at 94:20-97:2);

24  •   Nichiporuk's testimony that his scouting, forced entry,

25      amount of time waited before forcing entry, manner of

26      pointing firearms, and search were in accordance with the

27      training he received and no one every told him otherwise.

28      (Nichiporuk Depo. at 85:10-87:21).

1    Plaintiffs also submit evidence that Messerschmidt's

2 superiors, Lawrence, Ornales and Deputy D.A. Wilson reviewed the

3 warrant affidavit before it was submitted and that Lieutenants

4 Maxwell and Evans reviewed audiotapes and reports regarding the

5 entry.  (Messerschmidt Depo. at 30:25-32:22; Deposition of Patrick

6 Edward Maxwell, August 8, 2006 ("Maxwell Depo."), attached as Exh.

7 CC to the Mann Decl., 36:15-37:5, 51:17-53:11, 55:10-25, 81:13-21,

8 138:12-129:3, & 37:23-39:13).

9    Plaintiffs are correct that this testimony is relevant to

10 their _Monell_ claims.  However, this Court cannot determine, based

11 on this evidence alone, that Individual Defendants acted pursuant

12 to County policy, custom or practice.  Rather, the evidence shows

13 that these particular Individual Defendants _believe_ they acted in

14 accordance with such policy.  Therefore, the Court denies

15 Plaintiffs' Motion for Summary Adjudication on this issue.

16          **2.   Whether Plaintiffs Have Presented Sufficient**

17              **Evidence of a Constitutionally Infirm Policy to**

18              **Withstand Summary Judgment on Their _Monell_ Claims**

19    Municipal Defendants contend that they are entitled to summary

20 judgment on Plaintiffs' _Monell_ claims because Plaintiffs fail to

21 present any evidence of a custom, policy or practice that caused a

22 violation of federal constitutional rights.  Defendants argue that

23 Plaintiffs have, likewise, failed to establish that Individual

24 Defendants committed some wrong, and that the Municipal Defendants'

25 policy was the "moving force" behind that conduct.

26    A policy is a "deliberate choice to follow a course of action

27 . . . made from among various alternatives by the official or

28 officials responsible for establishing final policy with respect to

the subject matter in question." _Fairley v. Luman_, 281 F.3d 913,
918 (9th Cir. 2002)(per curiam)(internal citations omitted).
Therefore, liability may attach when an employee acts pursuant to
an "expressly adopted official policy," _Lytle v. Carl_, 382 F.3d
978, 982 (9th Cir. 2004), or where an employee committed a
constitutional violation pursuant to a "long standing practice or
custom." _Webb v. Sloan_, 330 F.3d 1158, 1164 (9th Cir. 2003), _cert._
_denied_, 540 U.S. 1141 (2004). Regardless, the policy or practice
must be so "persistent and widespread" that it constitutes a
"permanent and well settled city policy." _Fairley_, 281 F.3d at
918. The custom, policy or practice need not, in and of itself, be
unconstitutional in order to permit _Monell_ liability. _City of_
_Canton v. Harris_, 489 U.S. 378, 386 (1989). Additionally, such
policy may be one of action or inaction. _Long v. County of Los_
_Angeles_, 442 F.3d 1178, 1185 (9th Cir. 2006).

Plaintiffs contend that they may establish Municipal liability
by showing any one of the following three things: (1) a custom,
practice or policy, which caused a constitutional violation; (2)
that "the County was deliberately indifferent to a need to properly
train its employees," _Canton_, 489 U.S. at 387; _Fairley_, 281 F.3d at
917; or (3) that the County "ratified the unconstitutional
conduct." _Larez_, 946 F.2d at 630. While this Court agrees with
Plaintiffs' general premise that a municipality may, in certain
circumstances, be liable on _Monell_ claims where it ratified
unconstitutional conduct or failed to act, the requirement of a
"custom, practice or policy" is present under all such theories.

For instance, "[t]o impose liability against a county for its
failure to act, a plaintiff must show: (1) that a county employee

70

violated the plaintiff's constitutional rights; (2) that the county
has *customs or policies* that amount to deliberate indifference; and
(3) that these customs or policies were the moving force behind the
employee's violation of constitutional rights." <u>Long</u>, 442 F.3d at
1186 (emphasis added).  Likewise, under the "ratification" theory,
municipal liability attaches only where "a deliberate choice is
made from among various alternatives by the official or officials
responsible for establishing final policy with respect to the
subject matter in question."  See <u>Gillette v. Delmore</u>, 979 F.2d
1342, 1347 (9th Cir. 1992); <u>see</u> <u>also</u> <u>Larez</u>, 946 F.2d at 645 (in
which the court held that Chief Gates could be officially liable
based on his ratification of a decision that deprived plaintiffs of
their constitutional rights *if* the ratification was "attributable
to an official policy or custom.")

Therefore, that Plaintiffs are proceeding in their <u>Monell</u>
claims under these particular theories does not eliminate the fact
that they must submit evidence of an official policy or custom.
Plaintiffs have not done so here.  They have not clearly and
expressly articulated the policy they are challenging.  While
Plaintiffs do submit evidence in the form of testimony that tends
to support their arguments of failure to act and that Individual
Defendants acted according to custom and policy in committing the
alleged constitutional violations in this case, evidence of a
single alleged constitutional violation cannot establish a custom,
policy or practice under <u>Monell</u>.

In an attempt to demonstrate a custom, practice or policy,
Plaintiffs submit evidence of what they contend are incidents

1 similar to what occurred at the Millender Residence.[13]

2 Specifically, Plaintiffs cite four cases in which they claim

3 announcements were made almost simultaneously with breaking in,

4 "several incidents" where reports indicate that officers waited

5 approximately 20 or more seconds and then broke in, and other

6 incidents where the plan was to set a hook on the door before

7 announcing their presence, resulting in unnecessary property

8 destruction.   (Declaration of Samantha Koerner and Exhibits in

9 Support of Plaintiffs' Supplemental Brief ("Koerner Decl.") ¶¶ 4-

10 16).

11     This evidence does not create a genuine issue of fact.   The

12 numbers that Plaintiffs present regarding potentially similar

13 incidents are entirely without context.   For instance, no evidence

14 is presented regarding the overall number of warrants issued of the

15 same five-year period at issue. Furthermore, all of the specific

16 circumstances of each incident have not been verified and

17 disclosed.   Significantly, Plaintiffs have not provided evidence as

18 to the resolution of these claims.   Without such information, mere

19 evidence that claims were made is meaningless and unpersuasive.

20 Nevertheless, because there is outstanding discovery, which

21 Plaintiffs contend will support their <u>Monell</u> claims, this court

22 defers its ruling on these claims until discovery is complete.

23 _____

24     [13]   Because there were outstanding discovery issues at the
time Plaintiffs opposed Defendants' Motion for Summary Judgment,

25 the Court requested that the Parties submit supplemental briefing
on the status of such issues, and how they impacted the Parties'

26 ability to move for and oppose summary judgment.   In their
supplemental briefing, Plaintiffs note that, since the time they

27 filed their Opposition, they have received additional discovery in
the form of Search Warrant Service Packages.   Thus, in their

28 supplemental brief, Plaintiffs submit additional argument based on
the newly discovered evidence.

1  Defendants are hereby ordered to provide forthwith whatever
2  outstanding, responsive evidence they can locate with due
3  diligence.

4           **3.    Whether Sheriff Baca is a Proper Defendant**

5       Defendants argue that Sheriff Baca is not a proper Defendant,
6  because Plaintiffs' claim against him in his official capacity is
7  redundant of their claim against the County.   In support of their
8  argument, Municipal Defendants rely on <u>Robinette v. Barnes</u>, in
9  which the court dismissed an official because there was no
10 procedural or remedial advantage to the plaintiff.   854 F.2d 909,
11 911 n.1 (6th Cir. 1988).   This Court agrees with Defendants that
12 Plaintiffs' claims against Sheriff Baca are superfluous.
13 Therefore, Municipal Defendants' Motion for Summary Judgment on
14 Plaintiffs' claim against Defendant Baca is granted.

15      **H.    Count Three - Violation of the 14th Amendment/42 U.S.C. §**
16           **1985(3)**

17      Municipal Defendants move for summary judgment on Count Three,
18 brought against all Defendants.   They argue that it creates
19 confusion, because although they appear to be asserting a
20 "conspiracy" claim under 42 U.S.C. § 1985(3), Plaintiffs assert in
21 the body of the count that "each police officer defendant is liable
22 to Plaintiffs under 42 U.S.C. 1981, 1982, and 1985." (Complaint ¶
23 26).   Still later in the same paragraph, Plaintiffs further allege
24 that all Defendants are liable "pursuant to 42 U.S.C. 1986." (<u>Id.</u>)
25 Defendants contend that, regardless of what Plaintiffs are actually
26 attempting to allege, they cannot maintain their claims under any
27 of the cited code sections.

28

                                   73

1          **1.   Plaintiffs' Claim for Conspiracy Under 42 U.S.C.**

2                **§ 1985(3)**

3        To state a claim for violation of 42 U.S.C. § 1985(3), a

4    plaintiff must allege and prove the following four elements:

5                (1) a conspiracy; (2) for the purpose of

6                depriving, either directly or indirectly

7                any person or class of persons of the equal

8                protection of the laws, or of the equal

9                privileges and immunities under the laws;

10               and (3) act in furtherance of the conspiracy;

11               (4) whereby a person is either injured in

12               his person or property or deprived of any

13               right or privilege of a citizen of the

14               United States.

15   United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S.

16   825, 828-29 (1983).  Furthermore, a claim under § 1985(3) can only

17   be maintained if there is "some racial, or perhaps otherwise class-

18   based, invidiously discriminatory animus behind the conspirators'

19   action."  Id. at 834 (quoting Griffin v. Breckenridge, 403 U.S. 88,

20   102-103 (1971)).

21       To prove a "conspiracy" under § 1985, "the plaintiff must show

22   an agreement or meeting of the minds by the defendants to violate

23   his constitutional rights."  Caldeira v. County of Kauai, 866 F.2d

24   1175, 1181 (9th Cir. 1989), cert. denied, 493 U.S. 817 (1989).

25   "[E]ach participant must at least share the common objective of the

26   conspiracy."  United Steel Workers of Am. V. Phelps Dodge, 865 F.2d

27   1539, 1541 (9th Cir. 1989).  "A mere allegation of conspiracy

28

                                 74

1 without factual specificity is insufficient." <u>Karim-Panahi v. Los</u>
2 <u>Angeles Police Dept.</u>, 839 F.2d 621, 625 (9th Cir. 1988).

3      Defendants argue that Plaintiffs set forth no specific facts
4 or evidence that Defendants' alleged actions were racially
5 motivated or class-based.  Defendants, on the other hand, point to
6 the testimony of Walker and Messerschmidt that the preparation and
7 execution of the search warrant had nothing to do with the
8 Millenders' race.  (Messerschmidt Decl. ¶ 39; Walker Decl. ¶ 22).
9 Similarly, Plaintiffs have provided no evidence of a "conspiracy,"
10 a "meeting of the minds," or any act "in furtherance of the
11 conspiracy."

12      In Opposition to Defendants' Motion, Plaintiffs contend that:
13 (1) Defendants' failure to provide timely discovery responses has
14 impacted Plaintiffs' ability to oppose the Motion; (2) Regardless
15 of discovery issues, Plaintiffs have a list of personnel complaints
16 provided by Defendants, which includes 15 complaints, many of which
17 directly mention racial discrimination; and (3) this was not your
18 typical police misconduct case in which police come upon a suspect
19 without any previous contact.  (Plaintiff's Opp. to MD's MSJ at
20 6:19-8:4).

21      Because of the discovery issues complained of, Plaintiffs have
22 submitted supplemental briefing since the filing of their
23 Opposition.  In that Supplemental Briefing, Plaintiffs acknowledge
24 that Defendants have provided 73, out of a supposed 90, claims
25 dating between 11/16/98 and 10/9/03 and alleging wrongful search
26 and/or entry .  (Plaintiffs' Supp. Brief at 10:4-16).  Plaintiffs
27 note that, among these, "2 specifically allege race discrimination;
28 2 allege retaliation for not allowing sheriffs into the house

1 because they don't have a warrant; and 1 alleges retaliation for
2 having previously filed a lawsuit against the Sheriff's
3 Department." (Koerner Decl. ¶ 19). As to the 15 personnel
4 complaints Plaintiff already had, claims include "traffic
5 citation," "traffic citation/discrimination," "traffic stop,"
6 improper search," "racial profiling," "improper detention," "use of
7 force," etc.  Plaintiffs contend that there are "clearly"
8 complaints of overt racial discrimination and that others, if
9 probed further, would most likely include racial discrimination a
10 well.  By the Court's count, one of the claims includes a specific
11 reference to race in the actual "title" of the Complaint (racial
12 profiling), and one more specifically mentions discrimination
13 (traffic citation/discrimination).  This list appears to include
14 complaints against the 27 originally named Individual Defendants
15 for a period of at least 1999 through November 2003.  (Cook Decl.
16 Exh. LL).

17      Plaintiffs appear to be arguing that they are part of a
18 protected class in that they are African-American. (Complaint ¶
19 26).  They may even be arguing that they are protected in the sense
20 that they are being retaliated against because a family member
21 filed and won a lawsuit against the LASD and/or they would not let
22 the officers search their home without a warrant.  This is unclear,
23 because Plaintiffs do not specifically state any information about
24 the "protected class" in their Opposition.  Rather, the Court has
25 made these assumption based on Plaintiffs' discussion of the claims
26 and lawsuits against Defendants.  Plaintiffs make no link, however,
27 between these claims and any actions taken against Plaintiffs.
28 This Court agrees with Defendants that Plaintiffs have made no

1  specific allegations as to how Defendants conspired together and

2  have submitted no evidence that any actions they took were based on

3  race or other "membership" in a protected class.

4      In their Opposition, Plaintiffs' appear to be arguing that the

5  "conspiracy" is based on the following facts: (1) Messershcmidt

6  worked up his case for a couple of weeks; (2) several people looked

7  at his affidavit; (3) Messerschmidt asked around and was informed

8  that the Millender Residence was a "problem" house; (4) the entry

9  team met a the Millender residence the day before the search and

10  spoke with Mrs. Millender and Brenda; (5) according to Mrs.

11  Millender (but disputed by Defendants), deputies asked if they

12  could come in to her house, she said only with a warrant, and they

13  laughed; and (6) after meeting with the Millenders, Defendants

14  spent the day planning how they would serve the warrant knowing

15  they would have the opportunity to teach Mrs. Millender a lesson

16  for her failure to cooperate.  Plaintiffs do not cite evidence in

17  support of any of these statements.

18      Plaintiffs cannot rely merely on the fact that they are

19  African American and that Defendants planned for and executed a

20  search of their residence.  Thus, Plaintiffs have provided no

21  evidence whatsoever of any racial or other class-based motivations,

22  a conspiracy, or any acts in furtherance of a conspiracy.

23  Considering the evidence presented in the light most favorable to

24  Plaintiffs, this Court finds that Plaintiffs have not presented

25  evidence sufficient to create a genuine issue of material fact and

26  grants Defendants' Motion for Summary Judgment on Plaintiffs claim

27  under 42 U.S.C. § 1985(3).

28

1           **2.   Plaintiffs' Claim Under 42 U.S.C. § 1981**

2      Count Three also states that "each police officer defendant is

3 liable to Plaintiffs under 42 U.S.C. 1981 . . . ."  (Complaint ¶

4 26).   Section 1981 provides in relevant part:

5           All persons within the jurisdiction of the

6           United States shall have the same right in

7           every State and territory to make and enforce

8           contracts, to sue, be parties, give evidence,

9           and to the full and equal benefit of all laws

10           and proceedings for the security of persons

11           and property as is enjoyed by white citizens,

12           and shall be subject to like punishment,

13           pains, penalties, taxes, licenses, and

14           exactions of every kind, and to no other.

15 42 U.S.C. § 1981 (West 2003).   "An important purpose of section

16 1981 is to eliminate race based interference with the right of each

17 citizen to contract."   <u>Imagineering, Inc. v. Kiewit Pacific Co.,</u>

18 976 F.2d 1303, 1318 (9th Cir. 1992).   Plaintiffs make no

19 allegations in this regard.   Furthermore, Plaintiffs do not

20 specifically oppose Defendants Motion in this regard.   Accordingly,

21 this Court grants Defendants' Motion for Summary Judgment on

22 Plaintiffs' claim under 42 U.S.C. § 1981.

23           **3.   Plaintiffs' Claim Under 42 U.S.C. § 1982**

24      Count Three also states that "each police officer defendants

25 is liable to Plaintiffs under 42 U.S.C. . . . 1982 . . . ."

26 (Complaint ¶ 26).   Section 1982 provides that: "All citizens of the

27 united States shall have the same right, in every State and

28 Territory, as is enjoyed by white citizens thereof to inherit,

1 purchase, lease, sell, hold, and convey real and personal

2 property."   42 U.S.C. § 1982 (West 2003).

3      "Racial discrimination must be shown to state a colorable

4 Section 1982 claim."  <u>W. Coast Theater Corp. v. City of Portland</u>,

5 897 F.2d 1519, 1527 (9th Cir. 1990).   Conclusory allegations and/or

6 unwarranted inferences are insufficient.   <u>Sprewell v. Golden State</u>

7 <u>Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001).   Defendants move this

8 Court for Summary Judgment on this claim, because Plaintiffs make

9 no allegations whatsoever regarding their right to "inherit,

10 purchase, lease, sell, hold, and convey real and personal

11 property."   Furthermore, Plaintiffs do not specifically oppose

12 Defendants Motion in this regard.   Accordingly, this Court grants

13 Defendants' Motion for Summary Judgment on Plaintiffs' claim under

14 42 U.S.C. § 1982.

15          **4.   Plaintiffs' Claim Under 42 U.S.C. § 1986**

16      Finally, Plaintiffs' Count Three states that "any governmental

17 any [sic] supervisorial police defendant who had the power to but

18 who did not prevent the violations of § 1985 are liable to each

19 plaintiff pursuant to 42 U.S.C. 1986."   (Complaint ¶ 26).   Section

20 1986 provides that:

21          Every person who, having knowledge that any

22          of the wrongs conspired to be done are about

23          to be committed, and having power to prevent

24          or aid in preventing the commission of the

25          same, neglects or refuses so to do, if such

26          wrongful act be committed, shall be liable to

27          the party injured . . . .

28

42 U.S.C. § 1986 (West 2003). A conspiracy under 42 U.S.C. § 1985 is a prerequisite to a valid claim under Section 1986. <u>See</u> <u>Karim-Panahi</u>, 839 F.2d at 625.

Defendants move for summary judgment on the ground that Plaintiffs cannot establish a claim for conspiracy under Section 1985. This Court has considered Plaintiffs' arguments and evidence in support of their Section 1985 claim and found them unconvincing. Because this Court has granted Defendants' Motion for Summary Judgment on the Section 1985(3) conspiracy claim, Plaintiffs cannot maintain their Section 1986 claim. Accordingly, Defendants' Motion for Summary Judgment on such claim is granted.

**I.   Count Four - Violation of California Constitution, Article I, §§ 1, 7 and 13**

Plaintiffs bring a claim for violation of California Constitution Article I, §§ 1, 7 and 13[14] against the County of Los

---

[14]   Article I, § 1 of the California Constitution reads: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness and privacy.

Article I, § 7 of the California Constitution states in pertinent part that:

> (a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . .

> (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens . . . .

Article I, § 13 provides that: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, articularly describing the place to be searched and the persons and things to be seized.

1  Angeles only.  Municipal Defendants move for summary judgment on

2  this claim on two grounds.

3      First, Municipal Defendants argue that, to the extent

4  Plaintiffs seek to maintain their claims for damages directly under

5  the California Constitution rather than an enabling statute, such

6  as Civil Code section 52.1, such claims must fail, because an

7  action for monetary damages is not available. Plaintiffs respond

8  that all provisions of the California Constitution are self-

9  executing and, therefore, support claims for declaratory relief or

10 injunction.  Katzberg v. Regents of the University of California,

11 29 Cal. 4th 300, 306 (2002).  Thus, Katzberg establishes a

12 framework for determining the relevant question - whether money

13 damages are available under the specific constitutional provision

14 at issue for the specific wrong alleged. Under such framework, a

15 court considering this question must first "look at the language

16 and history of the provision for an affirmative intent to authorize

17 a claim for damages." Reinhardt v. Santa Clara County, 2006 WL

18 662741, *8 (N.D. Cal.) (applying Katzberg, 29 cal. 4th at 317).

19 Where there is no such affirmative intent, the court must consider

20 whether an adequate remedy exists, the extent to which a

21 constitutional tort action would change established tort law, and

22 the nature and significance of the constitutional provision." Id.

23 Finally, "if these factors weigh against the recognition of a right

24 to damages, the inquiry ends.  If, however, the factors weigh in

25 favor of recognizing such a right, the court should also consider

26 any special factors counseling hesitation in recognizing a damages

27 action." Id.

28

1      As to Article I, § 7, the <u>Katzberg</u> court found that this

2   section did not manifest an intent to create an independent damages

3   remedy, and that alternative remedies were available under Cal.

4   Civ. Code § 52.1 and 42 U.S.C. § 1983.  29 Cal. 4th at 318-24.

5   Likewise, this Court finds that such alternative remedies are

6   available and that Plaintiffs have, in fact, brought claims under §

7   1983 and California Civil Code § 52.1.  Therefore, Municipal

8   Defendants are entitled to summary judgment on Plaintiffs' claim

9   under California Constitution Article I, § 7.

10      Plaintiffs' Count Four, however, also alleges violations of

11   California Constitution Article I, §§ 1 & 13.  The California

12   Supreme Court has held that a plaintiff can bring a private action

13   for injunctions under Article I, Section 1 for alleged violations

14   of privacy.  <u>Hill v. Nat'l Collegiate Athletic Assoc.</u>, 7 Cal. 4th

15   1, 8, 20 (1994).  However, no California state court has ruled on

16   this issue and neither has the Ninth Circuit.  This Court notes,

17   however, that Judge Phillips of the Central District of California

18   has addressed this question, and the question as it relates to

19   Article I, § 13.  <u>Smith v. County of Riverside</u>, No. EDCV 05-00512

20   VAP, at *16-18 (C.D. Cal. May 16 2006). While the <u>Smith</u> opinion is

21   not binding on this Court, Judge Phillips reasoning is persuasive

22   and applies to the facts of this case.

23      As to Article I, § 1, Plaintiffs have provided no reason as to

24   why this Court should allow an action for monetary damages.[15]

25   Furthermore, as with Plaintiffs Article I, § 7 claim, alternative

26

27      [15]    Plaintiffs contend that, in <u>Porten v. Univ. of San</u>
     <u>Francisco</u>, the court held that Article I, Section 1, supported an
28   action for money damages.  However, this Court does not agree.

1  remedies are available to Plaintiffs under Cal. Civil Code § 52.1

2  and 42 U.S.C. § 1983. Allowing Plaintiffs to sue for money damages

3  for an alleged state constitutional privacy violation would create

4  a new cause of action, altering established tort law in California.

5  Therefore, the Court grants Defendants' Motion for Summary Judgment

6  in regard to Plaintiffs' claims for violation of the California

7  Constitution, Article I, § 1.

8      Finally, the Court must consider Plaintiffs' claims under

9  Article I, § 13.  As Plaintiffs point out, the Katzberg court

10  specifically differentiated the rights flowing to a victim of an

11  illegal search and seizure from the remedies available under a due

12  process liberty rights violation.  29 Cal. 4th at 321-24.  Relying

13  on an opinion from the New York Court of Appeals, the California

14  Supreme Court in Katzberg stated that there was "historical support

15  for an implied remedy in damages" in the English common law.  Id.

16  at 322 (quoting Brown v. New York, 674 N.E. 2d 1129, 1139 (1996)).

17  Thus, the Katzberg court noted that its holding that no damages

18  remedy was available under Article I, § 7 was based in part on the

19  lack of evidence as to any "similar history with respect to the

20  liberty interest," indicating that he would have found a damages

21  remedy under Article I, § 13.  29 Cal. 4th at 323.  In the absence

22  of an actual California Supreme Court decision, this Court Must

23  apply the law as we believe the California Supreme Court would

24  apply it."  Astaire v. Best Film & Video Corp., 116 F.3d 1297, 1300

25  (9th Cir. 1997).

26      Therefore, this Court finds that Plaintiffs are entitled to

27  assert a claim for monetary damages under Article I, § 13 of the

28  California Constitution.  Accordingly, Defendants' Motion for

83

1 Summary Judgment on Plaintiffs' Count Four is denied as it relates

2 to Article I, § 13.

3     Because Plaintiffs' claim for violation of California

4 Constitution, Article I, § 13, remains, this Court must address

5 Defendants' second argument.  Municipal Defendants argue that

6 Plaintiffs' claim under the California Constitution is based on the

7 very same allegations as are Counts One and Two under the Federal

8 Constitution and Section 1983.  Specifically, the common

9 allegations are that Defendants allegedly "interfere[d] with

10 Plaintiffs' rights to be free from unreasonable invasions of their

11 privacy and unreasonable search and seizure and to be accorded due

12 process."  (Complaint ¶¶ 24, 25 & 27).  Thus, Municipal Defendants

13 argue that, because the claims are the same, the analysis is the

14 same and "[j]ust as defendants did not violate plaintiffs' federal

15 constitutional rights, so too was there no violation of state

16 constitutional rights."

17     Plaintiffs generally agree with Defendants, but make the

18 opposite argument - that because Plaintiffs have stated

19 constitutional violations under the Fourth and Fourteenth

20 Amendments, so to have they stated claims under the California

21 Constitution.  Additionally, Plaintiffs assert that the protections

22 of the California Constitution are broader than the United States

23 Constitution.  People v. Brisendine, 13 Cal. 3d 528 (1975).

24 However, they make no argument as to how, if true, this should

25 impact the Court's analysis.  Therefore, this Court interprets this

26 as an agreement by the Parties' that the Court's findings on the

27 probable cause and unreasonable search and seizure claims in regard

28

1 │ to the federal constitutional claims should apply equally to the

2 │ state claims.

3 │     **J.    Count Five - Violation of Civil Code Section 52.1(b)**

4 │     In Count Five of their Complaint, Plaintiffs assert a claim

5 │ for violation of Civil Code Section 52.1(b) against the County of

6 │ Los Angeles only.   Section 52.1(b) provides in pertinent part:

7 │     Any individual whose exercise or enjoyment of

8 │         rights secured by the Constitution or laws of

9 │         the United states, or of rights secured by the

10 │         Constitution or laws of this state, has been

11 │         interfered with, as described in subdivision(a),

12 │         may institute and prosecute in his or her own

13 │         name and on his or her own behalf a civil

14 │         action for damages . . . .

15 │ Cal. Civil Code § 52.1(b) (West Supp. 2007).   Thus, when read in

16 │ conjunction with Section 52.1(a), Plaintiffs constitutional rights

17 │ must have been interfered with "by threats, intimidation, or

18 │ coercion."   <u>See</u> Cal. Civil Code § 52.1(a). (West Supp. 2007).

19 │     Defendants move for summary judgment on this claim.   In

20 │ support of their Motion, Defendants argue that none of Plaintiffs'

21 │ constitutional rights were interfered with by the County of Los

22 │ Angeles.   Similarly, Plaintiffs move for summary adjudication on

23 │ the issue of whether Defendants are liable under *respondeat*

24 │ *superior*.

25 │     Plaintiffs argue that Individual Defendants violated their

26 │ constitutional rights.   Thus, Plaintiffs claim that the County is

27 │ liable for such violations under the doctrine of *respondeat*

28 │ *superior*.   Plaintiffs are correct that, under California law, the

1  county may be liable for the Individual Defendants' interference

2  with Plaintiffs' constitutional rights by threats, intimidation, or

3  coercion under the doctrine of *respondeat superior*.   See Venegas v.

4  County of Los Angeles, 32 Cal. 4th 820, 843 (2004).   Furthermore,

5  this Court has found that genuine issues of material fact exist as

6  to whether various Individual Defendants committed certain

7  constitutional violations.   Accordingly, Municipal Defendants'

8  Motion for Summary Judgment on Plaintiffs' claim for violation of

9  Section 52.1(b) is denied.   However, while this Court concludes

10  that the doctrine of *respondeat superior* is applicable *if*

11  *constitutional violations are proven*, this Court cannot at this

12  time determine that, as a matter of law, Defendants are liable

13  under the doctrine and entitled to relief under California Civil

14  Code § 52.1.   Therefore, Plaintiffs' Motion for Summary

15  Adjudication is also denied.

16      **K.    Count Six - Violation of Civil Code Section 51.7**

17          In Count Six of their Complaint, Plaintiffs assert a claim for

18  violation of California Civil Code Section 51.7 against the County

19  of Los Angeles only.   Section 51.7 provides in relevant part:

20                  (a)   All persons within the jurisdiction of

21              this state have the right to be free from

22              any violence, or intimidation by threat of

23              violence, committed against their persons or

24              property because of political affiliation,

25              or on account of any characteristic listed

26              or defined in subdivision (b) or (e) of

27              Section 51, or position in a labor dispute,

28              or because another person perceives them to

1           have one or more of those characteristics.

2           The identification in this subdivision of

3           particular bases of discrimination is

4           illustrative rather than restrictive.

5   Cal. Civil Code § 51.7 (West Supp. 2007).  Subdivisions (b) and (e)

6   of Section 51 list the characteristics as "sex, race, color,

7   religion, ancestry, national origin, disability, medical condition,

8   marital status, or sexual orientation.  Cal. Civil Code §§ 51(b) &

9   (e) (West Supp. 2007).

10      Municipal Defendants move for summary judgment on this claim

11  on the grounds that Plaintiffs' allegation of "invidious racial

12  animus," (Complaint ¶ 29), are entirely unsupported.  Specifically,

13  Defendants claim that Plaintiffs present no evidence that they were

14  subject to any violence, or threat of violence, because of their

15  race._ Plaintiffs respond with the argument that they were unable

16  to prepare adequately enough to oppose a motion on this issue due

17  to Defendants' failure to provide discovery.

18      As this Court previously discussed in regards to Plaintiffs'

19  claim for conspiracy under 42 U.S.C. § 1985(3), Plaintiffs'

20  argument must fail.  At the Court's request, Plaintiffs submitted

21  supplemental briefing on the status of outstanding discovery and

22  its impact on their ability to move for or oppose summary judgment.

23      In such briefing, Plaintiffs set forth further evidence that

24  Defendants had provided through discovery.  That evidence and its

25  application to Plaintiff's "racial animus" claims is discussed in

26  greater detail in regard to Plaintiffs' 42 U.S.C. § 1985(3) claim.

27  Such evidence, however, does not create a triable issue of fact on

28  this issue.  Furthermore, Plaintiffs only remaining issue with

1   discovery is that Defendants have not provided *all of the*

2   *responsive* documents, claims, etc.  Thus, if and when Defendants

3   further comply, Plaintiffs will simply receive more personnel

4   complaints, claims, etc. in regard to the department as a whole.

5   Such claims are not final judgments and can not establish that

6   Individual Defendants acted in a racially discriminatory manner.

7   Plaintiffs do not argue that they are awaiting discovery on

8   anything else, which would bear on these claims.  Furthermore, as

9   the Court discussed earlier, Plaintiffs have provided no specific

10  allegations or evidence regarding racial animus on the part of

11  these particular Individual Defendants.  Accordingly, Defendants'

12  Motion for Summary Judgment on Plaintiff's claim for violation of

13  California Civil Code § 51.7 is granted.

14      **L.   Count Seven - Negligence (Civil Code § 1714)**

15      In Count Seven of their Complaint, Plaintiffs assert a claim

16  for negligence against the County of Los Angeles only.  (Complaint

17  ¶¶ 30 & 31).  Defendants move for summary judgment on the

18  negligence claim on the grounds that the County is immune pursuant

19  to California Government Code § 815.  Section 815 provides that

20  "[e]xcept as otherwise provided by statute, a public entity is not

21  liable for an injury, whether such injury arises out of an act or

22  omission of the public entity or a public employee or any other

23  person."  California Government Code § 815 (West 1995).  In

24  response, Plaintiffs argue that the County is, in fact, liable

25  under the doctrine of *respondeat superior*.

26      At the outset, the Court notes the confusion among the Parties

27  as to what is actually alleged.  Defendants correctly argue that

28  the County cannot be held directly liable for its own acts or

88

1  omissions, because it is immune under Section 815.  However, in
2  their Opposition, Plaintiffs concede that they are not claiming
3  that the County is directly liable for negligence.  Rather,
4  Plaintiffs contend, pursuant to California Government Code § 815.2,
5  that the County is liable for the negligence of its employees based
6  on the theory of *respondeat superior*.  Section 815.2 provides that:

7          a public entity is liable for injury proximately
8          caused by an act or omission of an employee of
9          the public entity within the scope of his
10         employment if the act or omission would, apart
11         from this section, have given rise to a cause of
12         action against that employee or his personal
13         representative."

14 California Government Code § 815.2 (West 1995).  Thus, Plaintiffs
15 claim that the County is liable for the negligent acts or omissions
16 of its employees, such as detaining and threatening to use force
17 against Plaintiffs and for their negligent hiring, training,
18 supervision and discipline of other employees of the County.

19     Accordingly, Municipal Defendants' Motion for Summary Judgment
20 as to Count Seven is denied, on the grounds that they have not
21 properly challenged Plaintiffs' claims under Government Code §
22 815.2.  However, this Court notes that, should Plaintiffs have any
23 intention of asserting a claim of direct negligence against the
24 County, they are precluded from doing so as a matter of law
25 pursuant to Government Code § 815.

26 **M.   Eleventh Amendment Immunity**

27     The Municipal Defendants' final argument is that they are
28 absolutely immune from tort liability under the Federal Civil

1  Rights Act.  Specifically, Municipal Defendants argue that, based
2  on the California Supreme Court's holding in <u>Venegas v. County of</u>
3  <u>Los Angeles</u>, the Sheriff's Department and Sheriff Baca were acting
4  on behalf of the State of California while conducting criminal
5  investigations and performing law enforcement activities.  32 Cal.
6  4th 820 (2004).  The <u>Venegas</u> court held that "sheriffs act on
7  behalf of the state when performing law enforcement activities,"
8  such that, "when acting in their law enforcement roles, California
9  sheriffs are . . . absolutely immune from prosecution for asserted
10  violations of [42 U.S.C. § 1983]." <u>Id.</u> at 826.

11      This Court agrees with Plaintiffs, however, that "[q]uestions
12  regarding section 1983 liability implicate federal, not state law."
13  <u>Brewster v. Shasta County</u>, 275 F.3d 803, 811 (9th Cir. 2001).  The
14  Ninth Circuit has specifically held that, "[a]lthough we must
15  consider the state's legal characterization of the government
16  entities which are parties to these actions, federal law provides
17  the rule of decision in section 1983 actions." <u>Streit v. County of</u>
18  <u>Los Angeles</u>, 236 F.3d 552, 560 (9th Cir. 2001).  Based on <u>Streit</u>,
19  LASD and Sheriff Baca are not arms of the state and are not
20  entitled to Eleventh Amendment immunity.  Accordingly, Municipal
21  Defendants' Motion for Summary Judgment in this regard is denied.
22  However, to the extent that this Court has already granted
23  Municipal Defendants' Summary Judgment on Plaintiffs <u>Monell</u> claims,
24  this issue is moot.

25
26
27
28

**V.    Conclusion**

For all the foregoing reasons, this Court (1) Grants in part and denies in part Plaintiffs' Notice of Motion and Motion for Summary Adjudication; (2) Grants in part and denies in part Individual Defendants' Notice of Motion and Motion for Summary Judgment and/or Summary Adjudication of Issues; and (3) Grants in part and denies in part Municipal Defendants' Notice of Motion and Motion for Summary Judgment or, in the Alternative, for Summary Adjudication.  The Court defers its ruling on Municipal Defendants' Motion as it relates to Plaintiffs' <u>Monell</u> claims until discovery is complete.  Defendants are hereby ordered to provide forthwith all outstanding, responsive discovery they can locate with due diligence.

The Court sets a status conference for 11:00 a.m. on Monday, March 26, 2007 to discuss the status of discovery and possible bifurcation of Plaintiffs' <u>Monell</u> claims.


IT IS SO ORDERED.

Dated: _____     _____

                                 DEAN D. PREGERSON
                                 United States District Judge

//
//
//
//
//
//
//
//

91